1  Laura Marquez-Garrett, SBN 221542
   laura@socialmediavictims.org
2  SOCIAL MEDIA VICTIMS LAW CENTER
   1390 Market St, Suite 200
3  San Francisco, CA 94102
   Ph: 206-294-1348
4
5  Attorney For Plaintiffs

6              UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF CALIFORNIA
7              SAN FRANCISCO DIVISION
8

9  C.C., individually and as next of friend to    Case No. _____
   minor C.L.
10
                         Plaintiff,              COMPLAINT FOR PERSONAL
11         v.                                    INJURIES
12
   META PLATFORMS, INC., formally
13 known as FACEBOOK, INC.; SNAP,
   INC.; TIKTOK INC.; BYTEDANCE INC.,
14
                         Defendants.
15

16

17
         "In these digital public spaces, which are privately owned and tend to be run
18       for profit, there can be tension between what's best for the technology company
         and what's best for the individual user or for society. Business models are often
19       built around maximizing user engagement as opposed to safeguarding users'
         health and ensuring that users engage with one another in safe and healthy ways.
20       … Technology companies must step up and take responsibility for creating a
         safe digital environment for children and youth. Today, most companies are not
21       transparent about the impact of their products, which prevents parents and
         young people from making informed decisions and researchers from identifying
22       problems and solutions."
23
   *Protecting Youth Mental Health,* The U.S. Surgeon General's Advisory (December 7, 2021)
24
         Plaintiff C.C., individually and as next of friend to minor plaintiff C.L., brings this action
25
   against Meta Platforms, Inc., formerly known as Facebook, Inc. ("Meta"), doing business as
26
   Facebook ("Facebook") and Instagram ("Instagram"), Snap, Inc., doing business as Snapchat
27
   ("Snapchat"), and TikTok Inc. and ByteDance Inc. (collectively, "TikTok") and alleges as follows:
28

## I.     INTRODUCTION

**A.     Plaintiff's Claims**

1.      This product liability action seeks to hold Defendants products responsible for causing and contributing to burgeoning mental health crisis perpetrated upon the children and teenagers of the United States by Defendants and, specifically for the injuries it caused minor C.L. The injuries proximately caused by Defendants' unreasonably dangerous social media products – Facebook, Instagram, Snapchat, and TikTok – include but are not limited to severe addictions and dependencies, anxiety, depression, lack of focus and lack of interest in non-social media activities, self-harm.

2.      Defendants' products likewise caused foreseeable harms to Plaintiff C.C. who did not consent to Defendants distributing or otherwise providing his child with access and was emotionally and financially harmed by Defendants' addictive design and provision of harmful and defective social media products to his minor child.

3.      Each of Defendants' products contains unique product features which are intended to and do encourage addiction, and unlawful content and use of said products, to the detriment of Defendants' minor users.

4.      These social media products create a "perfect storm" of addiction, social comparison, and exposure to incredibly harmful content and harmful product features. Defendants program and operate their algorithms and social media products more generally in a manner that prioritizes engagement and profits over user safety. This includes designing and distributing inherently dangerous products that appeal to kids, and operating algorithms and other technologies in a manner that promotes and amplifies harmful content.

5.      Defendants also advertise their products in misleading ways, assuring parents and the public that their products are safe and fun and that they utilize their technologies to ensure a safe and age-appropriate experience. Nothing could be further from the truth.

6.      Plaintiff suffered several emotional, physical, and financial harms as a result—all of which are a symptom of the current health crisis among American youth and, by natural and foreseeable extension, American families, caused by certain, harmful social

media products such as the ones at issue in this case.

**B.     Defendants Know or Should Know of the Harm Their Products Cause.**

7.     In late 2021, a Facebook whistleblower disclosed thousands of internal Meta documents to the United States Securities Exchange Commission (the "SEC") and Congress. The Facebook Papers prove known dangerous designs and design defects as well as operational decisions and calculations, and a causal relationship between use of Defendants' various social media products in their current form and resulting addiction, anxiety, depression, eating disorders, exploitation and grooming, and what Meta internally refers to as "SSI" (Suicide and Self Injury). While the Facebook Papers originate from Meta, they prove known dangerous designs and design defects as well as other dangers caused by the social media products of both Defendants.[1]

8.     Defendants have knowledge about the harms their products cause users, particularly teen, child, and other vulnerable user populations, and all Defendants continue to operate those products in a harmful and dangerous manner anyway and in the interest of competing with one another and increasing already astronomical profits. Meta is simply the only one whose documents have been disclosed; even then, Plaintiffs anticipate literal truckloads of additional evidence that will support these claims and show precisely what these social media designers and distributors have done in the name of corporate greed.

9.     These Defendants are making calculated cost-benefit business decisions and are consistently prioritizing their already astronomical profits over human life.

10.     The harms at issue in this case all arise from Defendants' product designs and/or inadequate warnings.

**C.     The Social Media Epidemic Among Children**

11.     On December 7, 2021, the United States Surgeon General issued an advisory

---

[1] Examples of the Facebook papers have been published by the Wall Street Journal (https://digitalwellbeing.org/the-facebook-files-on-instagram-harms-all-leaked-slides-on-a-single-page/), Gizmodo (https://gizmodo.com/facebook-papers-how-to-read-1848702919), and other publishers, and have been disclosed to the SEC, Congress, and others on a global scale. Plaintiffs expressly incorporate all such documents into this Complaint by reference, which are central and material to certain of Plaintiffs' claims.

cataloging a dramatic increase in teen mental health crises including suicides, attempted suicides, eating disorders, anxiety, depression, self-harm, and inpatient admissions. Between 2007 and 2018, for example, suicide rates among youth ages 12 to 16 in the U.S. increased a staggering 146 percent. Several cities across the United States have been experiencing teen suicide rates in the range of 1 every year or other year, which is an absolute crisis for our country—the death of a child is something that should be an exception and not a rule. The incidence of serious depression and dissatisfaction with life in this age group has likewise increased dramatically, and there is no question that these harms relate in no small part to companies like Defendants.

12.     The most significant and far-reaching change to the lives of young people in the last ten years has been the widespread adoption of social media platforms and prominently, for purposes of this lawsuit.

   a. The Facebook product, founded in 2004, but not made available to everyone until September 2006, and designed and distributed by Meta.

   b. The Instagram product, launched in 2010, acquired by Facebook (now Meta) in 2012, and designed and distributed by Meta.

   c. The Snapchat product, launched in 2011 and designed and distributed by Snap, Inc.

   d. The TikTok product, launched in 2016 and designed and distributed by TikTok.

13.     By 2014, 80 percent of high-school students said they used social media daily, and 24 percent said that they were online "almost constantly." Moreover, there are an estimated 24.5 million teen internet users in the U.S. alone. What this means tens of millions of U.S. teens (aged 13 to 17) using each of these defendants' social media products on a regular basis.

14.     On information and belief, Meta, Snap, and TikTok all target and market to teens and children, including children under the age of 13, and are aware that they are providing their dangerous social media products to children under 13, but deliberately

designed their products in a manner intended and that does make it easier for these underage users to open social media accounts. In some cases, they have even made it easier for underage users to open multiple accounts on the same app.

15.     Users under the age of 18 make up a significant percentage of all social media users in the United States and represent Defendants' only significant opportunity for growth due to saturation of the adult market. Meta, Snap, and TikTok see them as a gateway for other potential users, that is, they use minors to recruit parents and adult relatives as well as younger siblings – including pre-teen siblings Defendants are not permitted provide accounts to but to whom Defendants do provide accounts, by simply refusing to verify age and identification on the front end and then by turning a blind eye where possible. On information and belief, U.S. teens also are the most lucrative age group for each of these Defendants when it comes to advertising revenue.

**D.     Disparities Between Public Statements and Harm to Children**

16.     Peer reviewed studies and available medical science have also identified a particular type of social media and electronic device use associated with major mental health injuries, including depression, self-harm, eating disorders, suicide attempts and ideation, dissatisfaction with life, depression, and sleep deprivation. Large observational studies and experimental results also point to heavy use of certain social media products as cause of increased depression, suicidal ideation, and sleep deprivation among teenagers, particularly teenage girls. Meta, Snap, and TikTok have spent years publicly denying these findings— while internally confirming them.

17.     Meta, Snap, and TikTok have denied for years that their products are harmful or addictive while, in fact, their products are harmful and addictive, facts that the social media industry has been aware of for years. Meta, Snap, and TikTok knew the truth and chose to conceal it and not disclose to the public or parents of young users, as Defendants knew that such disclosure would prevent them from further growth and development of these products and product features.

18.     In Meta's case, for example only, the Facebook Papers include years' worth

of studies and reports discussing the fact that Meta's social media products are addictive and harmful, and that use of those products can and does lead to serious mental health issues in a significant number of users, including things like anxiety, depression, eating disorders, and SSI. This includes research confirming that higher engagement (i.e. more sessions and/or time spent over a certain threshold) causes higher negative effect for users, and other hallmarks of addiction (referred to by Meta as "problematic use"). In late 2019, Meta conducted an "exploratory study" in the United States, aimed at examining "Teen Girls Body Image and Social Comparison on Instagram."[2] These studies confirmed that certain features contained in Meta, Snap, and TikTok's social media products make certain social comparison-based harms worse for a significant percentage of teen girls. See, supra, "Teen Girls Body Image and Social Comparison on Instagram – An Exploratory Study in the US," p. 29 (referring to its own product mechanics as "addicting" and noting that TikTok users often spend more than four hours on TikTok every day).



---

[2] *See* https://digitalwellbeing.org/wp-content/uploads/2021/10/Facebook-Files-Teen-Girls-Body-Image-and-Social-Comparison-on-Instagram.pdf

Id. at p. 29, 30. More to the point, Meta knows that "Aspects of Instagram exacerbate each other to create a perfect storm." Id. at p. 33 and 34. According to Meta, the "social comparison sweet spot" (id.)—a place of considerable harm to users, particularly teens and teen girls—lies at the center of Meta's product model and product features,





Id. at p. 33 and 34.

19.     The type of harms described in the Facebook Papers relate to specific product mechanisms and product features. Meta, Snap, and TikTok have designed each of their products to contain unique product features which are intended to and do encourage addiction, and unlawful content and use of said products, to the detriment of Defendants' minor users and their families.

20.     Defendants also know that their recommendations and other product features,

that is, features whereby Defendants promote and/or send content to users and otherwise try to connect users who, in fact, are often complete strangers, result in disproportionate harms to vulnerable users including children and teens. Yet Defendants continue to reap astronomical profits at the expense of these users.

21.     For example, each of these Defendants has a "friend" and/or "follow" recommendation feature in their social media product. This refers to a feature whereby Defendants recommend to users other users they may "want" to friend or follow, with the intent that these users will then connect via a friend request mechanism, direct messaging, and similar product features meant to increase engagement among users. These recommendation systems serve the singular purpose of making more money for Defendants in that they are meant to keep users engaged through connections, which connections are suggested, prompted, and encouraged by Defendants. But also, which connections involve complete strangers and where Defendants' own recommendation systems frequently make and perpetuate harmful recommendations.

22.     These recommendation systems do not add to the functionality of these social media products but serve the singular purpose of making more money for Defendants in that they keep users engaged through connections—again, connections suggested, prompted, and encouraged by Defendants and not requested by users themselves. But as these defendants also know, their product frequently makes recommendations and/or connections involving complete strangers and minors as well as recommendations that promote, amplify, and perpetuate incredibly harmful content.

23.     As it relates to their minor users, Facebook, Instagram, Snapchat, and TikTok know that these recommendation and promotion systems cause harm and that these harms could be avoided in multiple ways unilaterally (that is, by fixes to Defendants' own platform and irrespective of content). Defendants simply choose to not fix the known defects in their social media products, or provide warnings to users, because doing so would hurt their engagement, growth, and revenue.

24.     Meta, Snap, and TikTok also know that their products are contributing to teen

depression, anxiety, lack of focus, suicidal ideation, self-harm, suicide, and other mental health harms. Why don't they change these harmful product features and stop utilizing algorithms in connection, at least, with teen accounts? Because Defendants' top priority is growth and competition concerns, and Defendants see "acquiring and retaining" teens as essential to their survival.

25.     Teenagers and children spend significantly more time on social media than adults (both total time and user sessions—which are usage patterns linked to addiction), represent Defendants' greatest (if not only) growth opportunity in the US, and can be used by Defendants to recruit older and younger family members and friends. Advertisers also pay a premium for the time and attention of teenagers on Defendants' platforms.

26.     Meta, Snap, and TikTok also know that their social media products are widely used by children under the age of 13. Despite it being illegal for Defendants to knowingly permit persons under the age of 13 to use their platforms, Meta, Snap, and TikTok have spent millions (if not billions) of dollars over the last decade studying "tweens" to determine how to make their products more appealing to and increase engagement among them. Defendants see children under 13 as a tappable and valuable market, which they must capture for revenue and long-term competitive positioning. See also https://www.nytimes.com/2020/08/14/technology/tiktok-underage-users-ftc.html (insiders report knowledge of underage users posting and TikTok's failure to act).

27.     The reality is that children are a priority demographic for Meta, Snap, and TikTok and that they will do anything to increase and maintain engagement among them. On October 26, 2021, the New York Times reported on a 2018 internal Meta marketing report lamenting loss of teenage users to competitors' platforms as "an existential threat."[3] Defendants spend billions on these recruiting efforts, and do not care that they are harming children and teens in the process.

28.     Defendants go so far as to study brain and identify vulnerabilities and other

---

[3] https://www.nytimes.com/2021/10/16/technology/instagram-teens.html

areas where they can adjust their products and approach to appeal more to the teen demographic. For example, in December of 2021, Insider reported on an internal Meta document titled "The Power of Identities: Why Teens and Young Adults Choose Instagram." It is clear from this document that Meta, and its competitors, are marketing to children and teens – including in ways meant to exploit the differences between teens and adults.

29.     Identified among Meta's internal documents are other product features that cause harm to teen users, which product features are relatively standard among Defendants' products. For example, product features that enable users to like or love other user's content results in increased addiction and social comparison harms, which Meta considered hiding for the benefit of its users (referred to as "Project Daisy") but ultimately did not.[4]

30.     Another example is Direct Message feature possessed by Defendants' social media products, and lack of restrictions when it comes to teens and children. Defendants' products do something no other product does: they encourage children and teens to use their product, then they make those children and teens accessible to strangers (for example, by permitting public profiles and/or viewing of content posted by these children and teens), then they provide predators with a direct means of communication (Direct Messaging features) that is both unfettered and, according to Defendants, unmonitored. In fact, Defendants monitor and/or have the technology needed to detect critical harm areas, such as sexual exploitation, bullying, and even underage use.

31.     On information and belief, Defendants are incredibly guarded when it comes to the types of data they collect, to the point where they will not even disclose certain, critical information to parents and/or police and other law enforcement upon request.

32.     In the case of Defendant Snap, its product is even more harmful in this regard because of its disappearing design. The Snap product is designed in a manner that encourages and enables such abuse, which dangerous and defective design serves Snap's economic interests by increasing its user base. For example, one common pattern among predators–

---

[4] See https://www.nytimes.com/2020/01/17/business/instagram-likes.html

which Defendants know or should know about–is to find children and teens on Instagram and encourage them to open or move the discussion to Snapchat, as it is generally understood that it is easier to get away with child exploitation and abuse through Snap's disappearing message feature.

33.     At the same time, Defendant Snap's disappearing design and marketing of that feature is particularly harmful to teens who rely on Snap's representations when taking and sending photos, only learning after the fact that recipients have means to save photos. In the case of sexually explicit photos taken of and sent by minors, on information and belief, many of those photos ultimately are distributed and sold or offered for sale to adults on and off Defendants' social media platforms.

34.     Defendants are aware of the harms resulting from certain of their product designs and features and are aware of product changes that would make their social media products safer for young users, and that would make them safer for minor plaintiff C.L. Meta, Snap, and TikTok refuse and/or disregard such safety measures, however, in the name of corporate profit and engagement. Meta, Snap, and TikTok are unwilling to risk losing popularity and engagement among teen users, even if it means causing affirmative (sometimes fatal) harm to other teens and children as a result.

35.     For example, Meta, Snap, and TikTok products include features that enable users to like or love other user content, which features result in increased addiction and social comparison harms.

36.     One example includes access features each defendant has and makes available even in the case of minors. For example, instant messaging where Defendants not only proactively recommend connecting with certain users, but then knowingly provide adult users and other strangers with unfettered access to children and teens.

37.     Defendants know that teens are more vulnerable and suffer harms from use of their social media products at higher rates than adult users. Defendants also know that teens access social media longer and more often than adults

38.     Advertisers are willing to pay a premium for unfettered access to child and

teens users so Meta, Snap, and TikTok, in turn, work hard to make their social media products as appealing and addictive to children and teens as possible, even though it knows that they are harmful to children and teens.

**E.    Defendants' Focus on Profits Over Safety**

39.    Meta, Snap, and TikTok know the harmful impact their social media products have. Instead of warning users and/or re-designing their products to make them safer, however, Defendants choose enhancing profits over protecting human life.

40.    Large numbers of Meta, Snap, and TikTok users are "addicted" to these social media products. Indeed, the problematic use identified in medical literature is precisely the type of use Defendants have designed their products to encourage through psychological manipulation techniques—sometimes referred to as persuasive design—that is well-recognized to cause all the hallmarks of clinical addiction.

41.    Defendant Meta slowly switched its News Feed (in its Facebook and Instagram products) from maximizing time-spent to maximizing sessions, even though it knew that maximizing sessions is harmful to its users. Defendant Meta also knows that its "like" button causes harmful social comparison, and results in anxiety and depression in teens, and Meta leadership ultimately rejected recommendations to launch Project Daisy (in its pure and effective form) due to the risk of a slight engagement decrease. Meta documents show that Meta has repeatedly refused to protect its users from harm for fear of offending other users, decreasing teen engagement, and/or losing advertiser revenue as a result.

42.    Meta programs its algorithm for engagement, despite knowing that this results directly in the promotion and amplification of harmful content.

43.    Defendant Snap has designed product features that serve no utility but that help children and predators hide harmful content from parents and authorities, and that promote illegal and dangerous behavior. It's failure to enforce its one account rule further promotes and amplifies bullying and other unwanted interactions, making it impossible for victims to escape the ill effects of the Snap product. Defendant Snap also has implemented inherently addictive and dangerous product features, such as Snap Streaks and various

trophies and unknown rewards systems, meant to hook teens at any cost. Likewise, it has implemented various inherently dangerous features, non-communication features over the years, such as Snap Cash and Snap Maps.

44.     Defendant TikTok has designed and implemented inherently addictive product features, as well as technologies that go above and beyond standard algorithms utilized by many of its competitors. It knows or has reason to know when underage children are utilizing its social media product, exposes children to unwanted interactions through direct messaging features, and works to addict children to its product by any means necessary.

45.     Ultimately, Defendants all have control over their technology and product design and how it is used and implemented. In all cases, they can choose to keep users safe but, instead, Meta, Snap, and TikTok have chosen to make their products more popular and more accessible – at the cost the health and wellbeing of young users. Defendants know that their products are harmful and dangerous, could make them less harmful and less dangerous, but opt instead for attracting and retaining new users.

46.     On information and belief, Meta, Snap, and TikTok all represent to users and parents that they utilize technologies to keep users safe when, in fact, they have only implemented such technologies to a limited degree. These technologies do not require content moderation, but rather, function automatically and as part of the product itself. Moreover, these measures are only made necessary because of the content Defendants themselves are directing. Defendants can stop themselves from recommending and directing young users to violent, harmful, and disturbing content, and they can utilize their technologies to keep a significantly higher number of users safe than what they are currently doing.

47.     Meta, Snap, and TikTok are perfectly capable of enforcing their own Terms of Service, Community Standards, and other guidelines. They can adjust their selected controls in a manner that would better protect their users, especially children and teens, from certain, significant harms promoted and caused by Defendants' product features, user setting

options, recommendations, and algorithmic-driven product features. Yet, Defendants repeatedly choose profits over human life, which is not a choice Defendants have the right to make.

48.     On information and belief, Defendants Meta, Snap, and TikTok do not employ adequate safety controls in the development of their social media products and product features and, once invested in and/or launched, do not address safety issues as those become known.

49.     This is the business model utilized by all Defendants – engagement and growth over user safety – as evidenced by the inherently dangerous design and operation of their social media products and as will be supported by internal records belonging to each of these defendants. At any point any of these Defendants could have come forward and shared this information with the public, but they knew that doing so would have given their competitors an advantage and/or would have meant wholesale changes to their products and trajectory. Defendants chose to continue causing harm and concealed the truth instead.

F.     **Overview of Claims**

50.     Plaintiff brings claims of strict liability based upon Defendants' defective design of their social media products that render such products not reasonably safe for ordinary consumers or minor users. It is technologically feasible to design social media products that substantially decrease both the incidence and magnitude of harm to ordinary consumers and minors arising from their foreseeable use of such products with a negligible increase in production cost.

51.     Plaintiff also brings claims for strict liability based on Defendants' failure to provide adequate warnings to minor users and their parents of danger of mental, physical, and emotional harms and sexual abuse arising from foreseeable use of their social media products. The addictive quality of these products and their harmful algorithms are unknown to minor users and their parents.

52.     Plaintiff also bring claims for common law negligence arising from Defendants' unreasonably dangerous Instagram social media products and their failure to

warn of such dangers. Defendants knew, or in the exercise or ordinary care should have known, that their social media products were harmful to a significant percentage of their minor users and failed to re-design their products to ameliorate these harms. Defendants also failed to warn minor users and their parents of foreseeable dangers arising out of use of their social media products.

53.     Plaintiff also brings claims under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code, §§17200, et seq. The conduct and omissions alleged herein constitute unlawful, unfair, and/or fraudulent business practices prohibited by the UCL.

54.     Plaintiff also brings a claim for unjust enrichment. Defendants received a direct benefit from problematic and harmful use of their product. Under the circumstances stated herein, it would be unjust and inequitable for them to retain those ill-gotten benefits.

55.     Finally, Plaintiff brings a claim for invasion of privacy. Defendants' conduct detailed herein frustrated and intruded upon Plaintiff's fundamental right to protect his child and to monitor and control her use of social media, and this intrusion occurred in a manner that was highly offensive to a reasonable person

56.     Plaintiff's claims do not arise from third party content, but rather, Defendants' product features and designs, including but not limited to algorithms and other product features that addict minor users, amplify and promote harmful social comparison, affirmatively select and promote harmful content to vulnerable users based on their individualized demographic data and social media activity, direct harmful content in great concentrations to vulnerable user groups, put minor users in contact with dangerous adult predators, enable and encourage minors to hide harmful content from their family and friends, encourage and facilitate exploitation and abuse of minors through marketing, recommendation and messaging features, and data policies involving the concealment and/or destruction of information necessary to the protection of minors, and otherwise prioritize engagement (and Defendants' profits) over user safety.

## II.     PARTIES

57.     Plaintiff C.C. resides in Louisiana with his minor child, C.L. C.C. has not

entered into any User Agreements or other contractual relationships with any of the Defendants herein in connection with C.L's use of Defendants' products and disaffirms all agreements that his child may have entered with Defendants. Thus, Plaintiff is not bound by any arbitration, forum selection, choice of law, or class action waiver set forth in any such agreements.

58.     Defendant Meta Platforms, Inc., formerly known as Facebook, Inc., is a Delaware corporation with its principal place of business in Menlo Park, CA. Defendant Meta Platforms owns and operates the Facebook and Instagram social media platforms, application that are widely available to users throughout the United States and in California

59.     Defendant Snap, Inc. is a Delaware corporation with its principal place of business in Santa Monica, CA. Defendant Snap owns and operates the Snapchat social media platform, an application that is widely marketed by Snap and available to users throughout the United States and in California.

60.     Defendant TikTok Inc. is a California corporation with its principal place of business in Culver City, CA. Defendant TikTok owns and operates the TikTok social media platform, an application that is widely marketed by TikTok and available to users throughout the United States and in California.

61.     Defendant ByteDance Inc. is a Delaware corporation with its principal place of business in Mountain View, CA. Defendant ByteDance owns and/or operates TikTok Inc., and owns and/or operates the TikTok social media platform, an application that is widely marketed by TikTok and available to users throughout the United States and in California.

### III.     JURISDICTION AND VENUE

62.     This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, and Plaintiffs and Defendants are residents of different states.

63.     This Court has personal jurisdiction over Defendants because they are each headquartered and have their principal place of business in the State of California. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendants Meta, and

ByteDance's principal places of business are in the Northern District of California (in Menlo Park and Mountain View, California) and Defendants Snap and TikTok are residents of the State of California.

## IV.   DIVISIONAL ASSIGNMENT

64.    The case is properly assigned to the San Francisco Division pursuant to Civ. L. R. 3-2(c)–(d) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in San Mateo and Santa Clara County, where Defendants Meta and ByteDance maintain their primary places of business.

## V.   FACTUAL ALLEGATIONS

**A.    Meta and its Facebook Product**

65.    Facebook is an American online social network service that is part of the Meta Platforms. Facebook was founded in 2004, at which time, Facebook was nothing like the product it is today. In fact, when Facebook was first founded, only students at certain colleges and universities could use the social media product – and verification of college enrollment was required to access the social media product. This verification mechanism was a product feature having nothing to do with communication or operation of the Facebook social media product.

66.    In 2005, Facebook expanded and became accessible to students at twenty-one universities in the United Kingdom and others around the world. Meta launched a high school version of its Facebook product, which Meta CEO and majority shareholder, Mark Zuckerberg referred to as the next logical step. Even then, however, high school networks required an invitation to join.

67.    Facebook later expanded eligibility to employees of several companies, including Apple Inc. and Microsoft. On December 11, 2005, Facebook added universities in Australia and New Zealand to its network and, in September 2006, Facebook opened itself up to everyone. At the time, Facebook claimed that it was open only to persons aged 13 and older and with a valid email address, however, on information and belief, Facebook made the decision to no longer require verification of age and/or identity and did not actually verify

user email address, such that underage users could literally enter nonsense email addresses and would be provided by Meta with access to a Facebook account.

68.     Meta's history proves that Meta knows how to implement product features meant to restrict access to persons above a certain age or even employed in certain industries and at certain companies. Meta's initial audience was limited to college students and older, but in 2006, Meta made the deliberate, business decision to instead begin distributing its product to everyone in the world with wi-fi access, regardless of the consequences.

69.     Facebook then underwent a series of significant product changes, aimed at increasing user engagement and product growth, but again, without regard to user safety. To name only some examples,

> a.   In February 2009, Facebook launches the "like" button.
>
> b.   In August and October of 2011, Facebook launches Facebook Messenger.
>
> c.   In September 2011, Facebook increases the character limit for status updates from 500 to 5,000 (and later to 63,206) and starts allowing people to subscribe to non-friends.
>
> d.   In January 2012, Facebook starts showing advertisements in its news feed, called Feature Posts at the time.
>
> e.   In June 2012, Facebook launches Facebook Exchange (FBX), a real-time bidding ad system where advertisers can bid on users based on third-party websites visited by the users (as tracked by a cookie on the third-party website).
>
> f.   In June 2013, Facebook launches Stickers.
>
> g.   In March 2014, Facebook's facial recognition algorithm (DeepFace) reaches near-human accuracy in identifying faces.
>
> h.   In April 2014, Facebook launches anonymous login so people can use its product without giving Facebook their data.
>
> i.   In March 2015, makes clear that it wants to be an integrated bunch of

apps, each fulfilling a somewhat different role. At the time, the company's leading applications include Facebook (its main app), Messenger, and externally built and acquired apps like Instagram and WhatsApp. Facebook announces changes to Facebook Messenger to make it more of a platform, things like a new real-time comments system, embeddable videos, and spherical video.

j.      In June and July 2015, Facebook makes changes to its news feed algorithm, including use of information on how long people hover on a particular item to gauge levels of interest, in addition to activities it was already using (i.e. likes, comments, shares) as part of its algorithm and to determine what content to show Facebook users.

k.      In August 2015, Facebook launches its live-streaming product

l.      In April 2016, Facebook launched more tools for Facebook apps and Facebook Live; in addition, it is now considering the time that a person spends reading content off Facebook as part of its news feed algorithm process.

m.      In November 2016, Facebook launches games for its social media product, so users can play without having to install new apps.

n.      In November 2017, Facebook launches Facebook Creator, which is an app for mobile video posts that helps with content creation.

o.      In November 2007, Facebook launches Facebook Beacon, which is part of Facebook's advertisement system that sends data from external websites to Facebook for the purpose of allowing targeted advertisements and allowing users to share their activities with friends.

70.      Throughout these product changes, re-designs, and launches, Facebook founder and CEO, Mark Zuckerberg, made public statements assuring the world that safety was Meta's (then Facebook) top priority. For example, in February of 2017, he made a post

on his personal Facebook titled "Building Global Community," in which he talked at length about how Meta is focused on safety, how it intends to use its AI to the fullest to keep users safe, and how amazing Facebook is for bringing communities together, promoting critically important social groups, and other statements that we now know to be untrue, and profoundly dangerous, given what was actually happening at Facebook and what Mr. Zuckerberg knew about the harms his products were causing American youth.

71.     In 2017, however, Meta employees were already reporting to management that Facebook was causing harmful dependencies. Meta was already marketing to children under 13, despite clear legal mandates that it could not allow children under 13 on its social media product. And Meta leadership, Mr. Zuckerberg himself, was actively rejected proposed re-designs intended to minimize the harms to child and teen users, users like minor plaintiff C.L.

72.     Meta's recommendation-based feeds and product features were promoting harmful content. Meta's algorithms are programmed to prioritize number of interactions and not quality of interactions. Worded otherwise, Meta promotes and amplifies content based on engagement objectives and not the health and well-being of their users, which renders its social media products inherently dangerous and defective, particularly when used by teens and children.

73.     Over the years, Meta employees have offered countless suggestions and recommendations as to product changes Meta could make to better protect its users from the harms Meta products cause. And over the years, Meta leadership has declined, delayed, or outright ignored the vast majority of those in favor of its own financial and growth-related interests.

74.     Meta also, at the same time CEO Mark Zuckerberg was touting the importance and helpful function of Meta's group recommendations algorithm, was recognizing the massive number of truly harmful and horrific groups on its social media platform – and the fact that its algorithm was directing users, including children and teens, to these harmful groups. That is, these children and teens would never have been exposed to

such harmful content but for Meta's systems and its programming of those systems to prioritize engagement over user safety.

75.     More recently, Meta has conducted studies relating to social comparison harms. See, e.g., supra, "Social Comparison: Topics, celebrities, Like counts, selfies" and "Appearance-based Social Comparison on Instagram." One of the goals of these types of studies is to identify the types of algorithmically identified promoted content most harmful to social media users, and the degree of harm that content causes. Meta identified those categories, but ultimately determined that the promotion of such content is a large part of what makes social media products appealing to teens. Meta decided against changing its current product as a result. In other words, the promotion of harmful content has become so central to Defendants' business models that Defendants regularly opt to conceal the truth and continue harming users instead of making their products safer and less harmful.

76.     Facebook profile and privacy settings also cause harm. Users' profiles on Facebook may be public or private, which is a product feature over which Meta exercises complete control. On public profiles, any user can view the photos, videos, and other content posted by the user. On private profiles, the user's content may only be viewed by the user's followers, which the user must approve. At all times relevant, Facebook profiles were public by default and Facebook allowed all users to message and send follow requests to underage users. But even now, when Meta claims that it is defaulting certain categories of users on certain of its social media products into private profiles, all a user need do is change the profile setting and, once again, Meta will allow all users to message and send follow requests to underage users. Meta can protect users from this specific harm, can do so immediately, and chooses to not do so as a matter of engagement and growth.

77.     Permitting public profiles for underage users serves no critical purpose in terms of product functionality but, instead, it increases user engagement during onboarding (when a user first starts using a social media product) by increasing user connections and generally by providing all users with greater access to other users, in this case, irrespective of their age. Unfortunately for young children and teens, a numerically significant percentage

of those would-be connections are harmful. Defendants are aware of these harms and have opted to not make necessary and cost-effective changes to prevent it.

78.     Meta's Messenger settings also permit and encourage harm to "vulnerable" users. Harmful and dangerous interactions occur because of the Facebook Messaging product, which is integrated with the Facebook app. Specifically, Meta's chosen settings provide predators and other bad actors with direct and unsupervised access to children and teens. Meta knows that Direct Messages is where most unwanted interactions happen, for example, things like bullying and sexual exploitation of minors. Meta simply does not care enough to change its product settings, because it knows that changing them would also have a negative impact on engagement and, potentially, ad revenue.

79.     Meta's push notifications and emails encourage addictive behavior and are designed specifically to increase use of its social media products. In the case of Instagram, Defendant Meta collects individualized data – not just about the user, but also about the user's friends and contacts – and then selects content and notification frequency for its users and notifies them via text and email. Meta's notifications to individual users are specifically designed to, and do, prompt them to open Instagram and view the content Instagram selected, increasing sessions, and resulting in greater profits to Instagram. More to the point, even the format of these notifications has been designed and re-designed with the specific purpose of pulling users back onto the social media platform—irrespective of health or wellbeing.

80.     Facebook also incorporates several product features that serve no functionality purpose, but that do make Meta's product more appealing to children and teens, such as "likes" and in-app games, while simultaneously increasing social comparison pressure and resulting harm. The harm from these product features does not relate to a single "like" or filter, or any specific series of content or potential content. Rather, it is the product itself. Meta knows that these product features disproportionly harm teen girls and young women.[5]

---

[5] *See, e.g.*, the documents disclosed at https://digitalwellbeing.org/wp-content/uploads/2021/10/Facebook-Files-Appearance-based-Social-Comparison-on-Instagram-.pdf, *supra*.

81.     Facebook also creates images and GIFs for users to post on their videos and pictures. Meta has also acquired publishing rights to thousands of hours of music, which it provides to its users to attach to the videos and pictures that they post on Facebook. The GIFs, images, and music are integral to the user's Facebook post and are, in fact, designed to encourage posting. Indeed, in many cases, the only content in a user's Facebook post is the image, GIF or music supplied by Meta. When users incorporate images, GIFs, and music supplied by Meta into their postings, Meta is functioning as a co-publisher of such content. A Facebook user who incorporates images, GIFs or music supplied by Meta into their post is functionally equivalent to a novelist who incorporates illustrations into their story. Instagram can no longer characterize the images, GIFs, and music it supplies to its users as third-party content, just as the novelist cannot disclaim responsibility for illustrations contained in their book. Meta has made the deliberate decision to collaborate with its users in this regard and, as evidenced by Meta's internal documents, Meta's decision is motivated by the fact that such collaboration results in increased engagement and more profits for Meta itself.

82.     Meta directly profits from the content its users create in collaboration with Meta, as described above.

83.     Meta knows that it is harming teens yet, when faced with recommendations that will reduce such harms, Meta's leadership consistently opts for prioritization of profit over the health and well-being of its teen users.

84.     Millions of teen users use Meta's inherently dangerous and defective social media product every, single day.

**B.     Meta and It's Instagram Product**

85.     Instagram is a photo sharing social media application. Its original focus was to facilitate communication through images by featuring photos taken on mobile devices. Instagram launched in October 2010 and Facebook acquired it for $1 billion in April 2012. Once acquired, Instagram experienced exponential growth, design, and development changes. It went from 10 million monthly active users in September of 2012 to 50 million

weeks after the acquisition, to more than 600 million by December of 2016, and it continues to grow. Meta instituted dozens of product changes (also known as "growth hacks") that drove this increased engagement, but at the expense of the health and well-being of Instagram's users—especially teens and children.

86.    Meta's recommendation-based feeds and product features promote harmful content. Meta's algorithms are programmed to prioritize number of interactions and not quality of interactions. Worded otherwise, Defendants promote and amplify content based on engagement objectives and not the health and well-being of their users, which renders their social media products inherently dangerous and defective, particularly when used by teens and children.

87.    Both the Facebook and Instagram products show users a "feed." A user's "feed" is a comprised of a series of photos and videos posted by accounts that the user follows, along with advertising and content specifically selected and promoted by Instagram.

88.    Meta exerts control over a user's Instagram "feed," including through certain ranking mechanisms, escalation loops, and/or promotion of advertising and content specifically selected and promoted by Meta based on, among other things, its ongoing planning, assessment, and prioritization of the types of information most likely to increase engagement. In the case of certain user groups, like teens, this control translates to deliberate and repeated promotion of harmful and unhealthy content, which Meta knows is causing harm to its young users.

89.    The Instagram product also has a search feature called "Explore," where a user is shown an endless feed of content that is selected by an algorithm designed by Meta based upon the users' demographics and prior activity in the application. This is not content the user has searched for or requested. Instead, it is content Meta selects via its algorithms (which Meta in turn programs to increase engagement and in other ways Meta knows to be harmful to users, but more profitable to Meta), as well as paid advertisements created with Meta's assistance or approval, and the like.

90.    Meta designs and operates its product in a manner that promotes harmful

1   and/or unhealthy content. Meta is aware of these inherently dangerous product features and

2   has repeatedly decided against changing them and/or implementing readily available and

3   relatively inexpensive safety measures, for the stated purpose of ensuring continued growth,

4   engagement, and revenue increase.




See, supra, "Teen Mental Health Deep Dive," p. 28, 30, 54 (examples only).

91.     The Instagram product also has features known as "Reels" and "Stories," which promote the use of short videos and temporary posts, respectively. These products were developed to appeal to teens and Meta knows that these products are addictive, as well as defective. Meta prioritizes and promotes harmful content through these product features.

92.     The promotion of harmful content has become so central to Defendants' business models that Defendants regularly opt to conceal the truth and continue harming users instead of making their products safer and less harmful.

93.     Instagram profile and privacy settings also cause harm. Users' profiles on Instagram may be public or private, which is a product feature over which Meta exercises complete control. On public profiles, any user can view the photos, videos, and other content posted by the user. On private profiles, the user's content may only be viewed by the user's followers, which the user must approve. At all times relevant, Instagram profiles were public by default and Instagram allowed all users to message and send follow requests to underage users. But even now, when Instagram claims that it is defaulting certain categories of users into private profiles, all a user need do is change the profile setting and, once again, Instagram will allow all users to message and send follow requests to underage users. Meta can protect

users from this specific harm, can do so immediately, and chooses to not do so as a matter of engagement and growth.

94.     Permitting public profiles for underage users serves no critical purpose in terms of product functionality but, instead, it increases user engagement during onboarding (when a user first starts using a social media product) by increasing user connections and generally by providing all users with greater access to other users, in this case, irrespective of their age. Unfortunately for young children and teens, a numerically significant percentage of those would-be connections are harmful. Defendants are aware of these harms and have opted to not make necessary and cost-effective changes to prevent it.

95.     Instagram's Direct Message settings also permit and encourage harm to "vulnerable" users. Harmful and dangerous interactions occur because of the Instagram direct message feature and current user settings, that is, Meta's chosen settings provide predators and other bad actors with direct and unsupervised access to children and teens.

96.     Instagram's allowance of multiple accounts, refusal to verify age, identity, even authenticity of email addresses further exacerbates the harms by making it impossible to avoid unwanted interactions. Other users can literally open accounts as fast as those accounts can be blocked and, when coupled with the excessive and addictive usage habits Instagram promotes among teens, these features create a perfect storm for depression, anxiety, and Suicide and Self-Harm.

97.     Instagram's push notifications and emails encourage addictive behavior and are designed specifically to increase use of its social media products. In the case of Instagram, Defendant Meta collects individualized data – not just about the user, but also about the user's friends and contacts – and then selects content and notification frequency for its users and notifies them via text and email. Meta's notifications to individual users are specifically designed to, and do, prompt them to open Instagram and view the content Instagram selected, increasing sessions, and resulting in greater profits to Instagram. More to the point, even the format of these notifications has been designed and re-designed with the specific purpose of pulling users back onto the social media platform—irrespective of health or wellbeing.

98.     Instagram also incorporates several product features that serve no functionality purpose, but that do make Meta's product more appealing to children and teens (i.e., "likes" and filters, as well as avatars, emojis, and games) while simultaneously increasing social comparison pressure and resulting harm (i.e., "likes" and filters). Meta knows that these product features disproportionally harm teen girls and young women, yet Meta leadership—singularly focused on its economic bottom line—continued to reject product change recommendations that would have better protected users against these harms.

99.     Another example involves extensive testing Meta performed on its "like" button feature. Meta determined that its Instagram "like" product feature is a source of social comparison harm for many of its users. This is not surprising given that several of the Meta employees involved in creating that feature have since left Meta and have spoken publicly about the product's addictive nature and harmfulness.[6]

100.    What is surprising, however, is that Meta knows that its product feature is harmful, particularly to teens and young adults, and could easily hide or remove that product feature. But does not, for fear that hiding "likes" would result in lower engagement and less advertising revenue. This is a blatant example of Meta choosing its own profits over human life and, specifically, the health and well-being of a significant number teens, including Plaintiff's child.

101.    Instagram also creates images and GIFs for users to post on their videos and pictures. Meta has also acquired publishing rights to thousands of hours of music, which it provides to its users to attach to the videos and pictures that they post on Instagram. The GIFs, images, and music are integral to the user's Instagram post and are, in fact, designed to encourage posting. Indeed, in many cases, the only content in a user's Instagram post is the image, GIF or music supplied by Meta. When users incorporate images, GIFs, and music supplied by Meta into their postings, Meta is functioning as a co-publisher of such content. An Instagram user who incorporates images, GIFs or music supplied by Meta into their post

---

[6] *See, e.g.,* https://www.theguardian.com/technology/2017/oct/05/smartphone-addiction-silicon-valley-dystopia.

is functionally equivalent to a novelist who incorporates illustrations into their story. Instagram can no longer characterize the images, GIFs, and music it supplies to its users as third-party content, just as the novelist cannot disclaim responsibility for illustrations contained in their book. Meta has made the deliberate decision to collaborate with its users in this regard and, as evidenced by Meta's internal documents, Meta's decision is motivated by the fact that such collaboration results in increased engagement and more profits for Meta itself.

102.    Meta also has ownership and/or licensing, and other legal, rights in all third-party content, such that it is not "third-party content" at all. In 2012, Meta revised its Instagram Terms of Service to the following, [7]

To help us deliver interesting paid or sponsored content or promotions, you agree that a business or other entity may pay us to display your username, likeness, photos (along with any associated metadata), and/or actions you take, in connection with paid or sponsored content or promotions, without any compensation to you.

103.    Its current terms (effective January 4, 2022) are different, but still grant Meta the right to use all third-party content at Meta's sole and unilateral discretion.

104.    Meta directly profits from the videos and pictures its users create in collaboration with Meta, as described above.

105.    Meta knows that it is harming teens yet, when faced with recommendations that will reduce such harms, Meta's leadership consistently opts for prioritization of profit over the health and well-being of its teen users.

106.    Meta knows that underage users are on its platform and has deliberately designed its product in a manner intended to evade parental authority and consent, including but not limited to Meta's failure to verify age and identity, provision of multiple accounts, marketing aimed at informing minors that they can open multiple accounts, failure to provide a point of contact for parents to notify Meta of lack of consent, marketing aimed at children and that encourages children to use Meta's social media product without consent, and

---

[7] https://www.theverge.com/2012/12/18/3780158/instagrams-new-terms-of-service-what-they-really-mean

multiple other features and conduct by Meta aimed at ensuring young users have a means to access Meta's social media products no matter the circumstances.

107.    Meta's Instagram product is used by many millions of children every day.

**C.    Snap and its Snapchat Product**

108.    Snapchat was founded in 2011, by three Stanford college students, and quickly became a wildly popular social media product among U.S. teens. It is one of the most widely used social media products in the world and is used by more than 69% of all U.S. teens (age 13 to 17).8 Snapchat's headquarters is in Santa Monica, California.

109.    Snapchat started as a photo and short video sharing social media application that allows users to form groups and share posts or "Snaps" that disappear after being viewed by the recipients. The Snapchat product became well-known for its self-destructing content feature. Specifically, the Snapchat product allows users to form groups and share posts or "Snaps" that disappear after being viewed by the recipients. However, the Snapchat social media product quickly evolved from there, as its leadership made design changes and rapidly developed new product features intended to and that did increase Snapchat's popularity among teen users.

110.    In 2012, Snap added video capabilities to its Snapchat product, pushing the number of "snaps" to 50 million per day; in 2013, "Stories" and "Chat" features; in 2014, live video chat capabilities, "Our Story," Geofilters and Community Geofilters, and Snapcash.

111.    By 2015, advertisements were pervasive on Snapchat and, by 2018, 99% of Snap's total revenue came from advertising, according to internal company records. In other words, like Meta, Snap decided to monetize its userbase and, from that point forward, began changing its product in ways that made its product even more harmful to users but that paved the way for growth, engagement, and profits for Snap and its leadership and investors.

112.    By 2015, Snapchat had over 75 million monthly active users and was the most

---

8 *See* https://www.smartinsights.com/social-media-marketing/social-media-strategy/snapchat-statistics/

popular social media application amongst American teenagers in terms of number of users and time spent using the platform. Snap currently estimates having between 92.8 and 96.6 million users in the United States, with at least 17 to 17.7 million of those being children under the age of 18. Against this backdrop, Snap advertises and promotes its product as safe and fun—which could not be further from the truth.

113.    Snap uses an algorithm or similar technology to suggest connections, that is, Snap sends messages to users based on some secret formula Snap uses to determine whether someone should "friend" someone else. This is known as "Quick Add," and these Snap-initiated messages result in exposure to harmful contacts, bullying, and dangerous predators. This feature contributes nothing to the product itself and serves no informational or communication purpose. Similar to Meta's product, this product is designed to reinforce addiction and increase the odds of maintaining more users for longer.

114.    Snapchat users also have an "Explore" feed that displays content created by other users around the world. These product features are designed to grab and keep users' attention for as long as possible each day, and have led many people, from psychologists to government officials, to describe Snapchat as "dangerously addictive."

115.    As with Defendant Meta, and TikTok, Snap's algorithms and/or similar technologies determine the content that gets directed and/or populates its user experience on the Snapchat social media product. This includes content sent directly from Snap to its users, for Snap's own purposes, and prior to any sort of user search or request for such content.

116.    Snapchat offers several unique messaging and data features. It is perhaps most famous for its self-destructing content design feature, which appeals to minors and makes it more difficult for parents to monitor their children's social media activity. This is an inherently dangerous product feature because it both encourages and allows minor uses to exchange harmful, illegal, and sexually explicit images with adults, and provides those same adults with a safe and efficient vehicle to recruit victims. Snapchat is a go-to application for

sexual predators because of this product feature.[9]

117.    For years Snap has received reports of child abuse and bullying occurring through its product and because of its product features,[10] yet has kept those features in place as removing them would result in considerable impact on the popularity of Snap's social media product.

118.    Harmful and dangerous interactions likewise occur because of these and other Snapchat messaging features, which provide direct and unsupervised access to children and teens.

119.    But also, this is a dangerous product feature because it does not operate as advertised. Snap's disappearing design and marketing of this feature is particularly harmful to teens who rely on Snap's representations when taking and sending photos, only learning after the fact that recipients have means to save photos – and are often bullied, exploited, and/or sexually abused as a direct result. These are harms known to Snap.

120.    In 2014, Snapchat added "Stories" and "Chat" features that allowed users to post longer stories that could be viewed by users outside the user's friends. As with Meta's algorithms, Snap's technology promotes and amplifies harmful content as a means of increasing user engagement and growth opportunities. Snap has actual knowledge of the harm it is causing its users, and consistently prioritizes its own profits regardless.

121.    Snapchat also allows users to enable the sharing of their location, through a tool called Snap Map, which allows the users' followers (and the public for Snaps submitted by the users) to see the user's location on a map. At all times relevant, this feature was available to all users, including minors. This is an inherently dangerous product feature, which serves no practical purpose – but that does provide strangers and predators with access to the location of minor victims. This product feature has directly contributed to stalking and

---

[9] *See, e.g.*, https://phonespector.com/blog/what-are-the-dangers-of-snapchat-to-avoid/

[10] *See, e.g.*, https://www.forbes.com/sites/zakdoffman/2019/05/26/snapchats-self-destructing-messages-have-created-a-haven-for-child-abuse/?sh=411b8e1d399a (Snapchat Has Become A 'Haven for Child Abuse' With Its 'Self-Destructing Messages').

other, physical harms and assaults perpetrated on minors, and these are harms known to Snap.

122.    But also, Snap has developed artificial intelligence technology that detects adult users of Snapchat who send sexually explicit content to children and receive sexually explicit images from children. This technology furnishes Snap with actual knowledge that a significant number of minor users of Snapchat are solicited to send, and do send, sexually explicit photos and videos of themselves to adult users in violation of 18 U.S.C. § 1591(a)(1)-(2). Snap could protect its minor users, but in many instances, does not.

123.    Snap also has a "My Eyes Only" product, which many parents do not know about – including Plaintiff in this case. Snap's My Eyes Only Product encourages and enables young users to hide harmful content from parents by allowing them to hide content in a special tab that requires a passcode, and where content cannot be recovered – even by Snap itself – without the correct passcode. The content self-destructs if a user attempts to access the hidden folder with the wrong code. My Eyes Only has no practical purpose or use, other than to hide potentially harmful content from parents and/or legal owners of the devices used to access Snap. Moreover, while this information and evidence should be in Snap's possession and control, it has designed thus product in a way that causes the permanent loss of relevant and often incredibly material and incriminating evidence in the event of products liability lawsuit, like this one.

124.    On information and belief, Snap's disappearing messages are defective for this reason as well. Snap has possession, custody, or control of that data, knows that it will be relevant and material in the event of products liability litigation, but has designed its technologies – i.e. its advertised "disappearing" functionality which suggests that Snap itself no longer has access to such data – in a manner that frustrates and actively prevents parents from monitoring the activity of their underage children on Snap's social media product. These are serious defects, which Snap should be required to remedy immediately.

125.    Like Meta and TikTok, Snap also sends push notifications and emails to encourage addictive behavior and to increase use of its Snapchat product. Snap's communications are triggered and based upon information Snap collects from and about its

users, and Snap "pushes" these communications to teen users in excessive numbers and disruptive times of day. These notifications are specifically designed to, and do, prompt them to open Snapchat and view the content Snapchat selected, increasing sessions, and resulting in greater profits to Snap. Even the format of these notifications has been designed to pull users back on to the social media platform—irrespective of a user's health or wellbeing.

126.     The Snapchat social media product also features a series of rewards including trophies, streaks, and other signals of social recognition like the "likes" metrics available across other platforms. These features are designed to encourage users to share their videos and posts with the public. Moreover, these features serve no communication or informational purposes. They are designed to be addictive, and to encourage greater use of the Snap product without regard to any other content or third-party communication. But also, they have been repeatedly recognized by organizations and even government agencies around the world as being among the most addictive products when it comes to teen social media users.

127.     These product features serve no purpose other than creating dependencies on Snap's product by children and teens, which dependencies in turn cause sleep deprivation, anxiety, depression, anger, shame, interpersonal conflicts, and other serious harms to mental and physical health.

128.     Snapchat incorporates several other product features that serve no functionality purpose, but that do make Snap's product more appealing to children and teens (i.e., avatars, emojis, and games) while simultaneously using known mechanisms to addict those same children and teens (i.e. streaks and trophies offering unknown rewards). These features and the ones discussed above were particularly addictive to C.L. and were targeted to underage users like C.L.

129.     The Snap Streak feature is unique to Snap's product and is one of the most – if not the most – addictive products available "especially to teenagers."[11] Snap knows that its Snap Streak product is addictive and has known for years but continues to provide that

---

[11] *See* https://abcnews.go.com/Lifestyle/experts-warn-parents-snapchat-hook-teens-streaks/story?id=48778296

product to teens and children.

130.    These are just some examples of Snapchat's harmful product features.

131.    Snap has also developed images for users to decorate the pictures or videos they post, and Snap has developed Lenses which are augmented reality-based special effects and sounds for users to apply to pictures and videos users post on Snapchat, and World Lenses to augment the environment around posts. Snap also has acquired publication rights to music, audio, and video content that its users can incorporate in the pictures and videos they post on Snapchat.

132.    These images, Lenses, and licensed audio and video content supplied and created by Snapchat frequently make a material contribution to the creation or development of the user's Snapchat posts. Indeed, in many cases, the only content in a user's Snapchat post are images, Lenses, and licensed audio and video content supplied and created by Snapchat. When users incorporate images, Lenses, music, audio, and video content supplied by Snapchat posts, Snapchat makes a material contribution to the creation and/or development of their Snapchat postings and becomes a co-publisher of such content. When malign users incorporate images, Lenses, music, audio, and video content supplied by Snapchat to their posts, this enhances the psychic harm and defamatory sting that minor users experience from third-party postings on Defendants' platform.

133.    Moreover, Snap contracts for legal rights in this third-party content, such that it is not "third-party content" at all. Snap's current Terms of Service grant Snap several, sweeping sets of legal rights, from licensing to ownership, as follows (and for example only as there are several provisions in Snap's Terms of Service that address legal rights over user content, comments, and other usage and activities),

### 3. Rights You Grant Us

Many of our Services let you create, upload, post, send, receive, and store content. When you do that, you retain whatever ownership rights in that content you had to begin with. But you grant us a license to use that content. How broad that license is depends on which Services you use and the Settings you have selected.

For all content you submit to the Services, you grant Snap and our affiliates a worldwide, royalty-free, sublicensable, and transferable license to host, store, cache, use, display, reproduce, modify, adapt, edit, publish, analyze, transmit, and distribute that content. This license is for the purpose of operating, developing, providing, promoting, and improving the Services and researching and developing new ones. This license includes a right for us to make your content available to, and pass these rights along to, service providers with whom we have contractual relationships related to the provision of the Services, solely for the purpose of providing such Services.

134.    Snap directly profits from the videos and pictures and other content its users create in collaboration with Snap, as described above.

135.    Snap knows that it is harming teens yet consistently opts for prioritization of profit over the health and well-being of its teen users.

136.    Millions of teen and children use Snap's inherently dangerous and defective social media product every, single day.

**D.     TikTok and Its TikTok Product**

137.    TikTok is a video sharing social media application where users create, share, and view short video clips. Known in China as Douyin, TikTok hosts a variety of short-form user videos, from genres like pranks, stunts, tricks, jokes, dance, and entertainment with durations from 15 seconds to ten minutes. TikTok is the international version of Douyin, which was originally released in the Chinese market in September 2016. In 2017, TikTok was launched for iOS and Android in most markets outside of mainland China; however, it became available worldwide only after merging with another Chinese social media service, Musical.ly, on August 2, 2018.

138.    TikTok has been downloaded more than 130 times in the U.S. and it was ranked by Cloudflare as the most popular website of 2021. "TikTok was the world's most-visited website in 2021, overtaking YouTube in US watch time and Facebook in app

downloads for the first time."[12]

139.    Users on TikTok who open the TikTok application are automatically shown an endless stream of videos selected by an algorithm developed by TikTok to show content on the "for you" based upon the user's demographics, likes, and prior activity on the app.

140.    TikTok is like Meta and Snap in that it has designed its algorithms to addict users and cause them to spend as much time on the application as possible through advanced analytics that create a variable reward system tailored to user's viewing habits and interests.

141.    There are four main goals for TikTok's algorithm: which the company translates as "user value," "long-term user value," "creator value," and "platform value."

142.    An internal TikTok document was leaked, which document is titled "TikTok Algo 101." This document was created by TikTok's engineering team in Beijing and offers details about both the app's mathematical core and insight into the company's understanding of human nature. The document explains that in the pursuit of the company's "ultimate goal" of adding daily active users, it has chosen to optimize for two closely related metrics in the stream of videos it serves: "retention" — that is, whether a user comes back — and "time spent." The document offers a rough equation for how videos are scored, in which a prediction driven by machine learning and actual user behavior are summed up for each of three bits of data: likes, comments and playtime, as well as an indication that the video has been played.

143.    A recent Wall Street Journal report revealed how TikTok relies heavily on how much time users spend watching each video to steer them toward more videos that will keep them scrolling, and that process can sometimes lead young viewers down dangerous rabbit holes, and toward content that promotes suicide or self-harm.

144.    Another article, by the New York Times, explained how TikTok markets itself as an "artificial intelligence company." "The most obvious clue is right there when you open the app: the first thing you see isn't a feed of your friends, but a page called 'For You.'

---

[12] Emily Baker-White, *Inside Project Texas, TikTok's Big Answer To US Lawmakers' China Fears*, Buzzfeed, Mar. 10, 2022, https://www.buzzfeednews.com/article/emilybakerwhite/tiktok-project-texas-bytedance-user-data

It's an algorithmic feed based on videos you've interacted with, or even just watched. It never runs out of material. It is not, unless you train it to be, full of people you know, or things you've explicitly told it you want to see. It's full of things that you seem to have demonstrated you want to watch, no matter what you actually say you want to watch … Imagine a version of Facebook that was able to fill your feed before you'd friended a single person. That's TikTok." [13]

145.    TikTok's algorithm also, often works in concert with Meta's. For example, a teen may first learn about a harmful topic through Meta's algorithm, which potential harm is then identified by TikTok's algorithm, based on any number of unknown factors, and the TikTok product will amplify and promote that same harm through a virtual series of how-to videos. These are inherently dangerous and harmful product features, particularly when aimed at children.

146.    TikTok also features and promotes various "challenges" where users film themselves engaging in behavior that mimics and "one ups" other users posting videos related to a particular challenge. TikTok promotes users creating and posting videos of challenges identified by a system of hashtags that are promoted within TikTok's search feature.

147.    TikTok's app and algorithm have created an environment in which TikTok "challenges" are widely promoted and result in maximum user engagement and participation, thus financially benefitting Defendants. At the same time TikTok "challenges" involve users filming themselves engaging in behavior that mimics and often times "one-ups" other users posting videos performing the same or similar conduct, and these TikTok "challenges" routinely involve dangerous or risky conduct.

148.    TikTok's algorithm presents these often-dangerous "challenges" to users on their FYP and encourages users to create, share, and participate in the "challenge."

149.    Moreover, TikTok's algorithm products suffer from serious algorithmic bias,

---

[13] John Herrman, *How TikTok is Rewriting the World*, N.Y. Times, Mar. 10, 2019, *available at* https://www.nytimes.com/2019/03/10/style/what-is-tik-tok.html

including as it relates to race and low SES. Upon information and belief, TikTok is aware of these harms, including the fact that its algorithm pushes higher volumes of violent and dangerous content to members of protected classes. This is harmful content these users, users like the minor plaintiff, would not have seen but for TikTok's product design and programming.

150.    These are just some examples of how TikTok operates its product to generate profit, at the expense of the health and well-being of its users, particularly its child and teen users.

151.    Until mid 2021, TikTok also and by default made all users profiles "public," meaning that strangers, often adults, could view and message underage users of the TikTok app. This also meant that those strangers could then contact children directly, as happened in this case.

152.    TikTok has also developed artificial intelligence technology that detects adult users of TikTok who send sexually explicit content to children and receive sexually explicit images from children. This technology furnishes TikTok with actual knowledge that a significant number of minor users of TikTok are solicited to send and actually do send sexually explicit photos and videos of themselves to adult users in exchange for consideration in violation of 18 U.S.C. § 1591(a)(1)–(2). Yet, like Snap and Meta, TikTok uses this technology selectively and only when it is to the benefit of TikTok, enabling harms through its social media products in the interest of engagement.

153.    TikTok also sends push notifications and emails to encourage addictive behavior and to increase use of their TikTok product and sent such notices to C.L. TikTok's communications are triggered and based upon information TikTok collects from and about its users, and TikTok "pushes" these communications to teen users in excessive numbers and disruptive times of day. These notifications are specifically designed to, and do, prompt them to open TikTok and view the content TikTok selected, increasing sessions, and resulting in greater profits to TikTok. Even the format of these notifications has been designed to pull users back on to the social media platform—irrespective of a user's health or wellbeing.

154.    TikTok markets itself as a family friendly social media application, and markets to children and teens.

155.    TikTok exclusively controls and operates the TikTok platform for profit, which like Instagram and Snapchat, creates advertising revenue through maximizing the amount of time users spend on their platforms. Accordingly, while TikTok purports to have a minimum age requirement of 13-years-old, it does little to verify user age or enforce its age limitations despite knowledge that underage use is widespread.

156.    In fact, underage TikTok users will often post videos of themselves in which they clearly are not old enough to be using the TikTok social media product. On information and belief, TikTok's sophisticated algorithms can identify when a user has crooked teeth or a crack in their bedroom wall, so there is little question that those same algorithms can identify underage children in posted videos. But also, TikTok has actual knowledge of underage users. For example, in July 2020, TikTok reported that more than a third of its 49 million daily users in the United States were 14 years old or younger. And while some of those users were 13 or 14, at least one former employee reported that TikTok had actual knowledge of children even younger based on videos posted on the TikTok platform – yet failed to promptly take down those videos or close those accounts.[14] In fact, TikTok regularly knows or should know of underage users with accounts and who post videos on its platform, whether because of its algorithms, viewing by TikTok employees, and/or flagging by other TikTok users. In many such instances, TikTok does not suspend the account, require age verification, or notify the underage user's parents of such prohibited use.

157.    TikTok does not seek parental consent for underage users or provide warnings or adequate controls that would allow parents to monitor and limit the use of TikTok by their children. TikTok does not verify user age, enabling and encouraging teens and children to open TikTok accounts, providing any age they want, without parental knowledge or consent.

---

[14] Raymond Zhong & Sheera Frenkel, *A Third of TikTok's U.S. Users May Be 14 or Under, Raising Safety Questions*, N.Y. Times, Aug. 14, 2020, *available at* https://www.nytimes.com/2020/08/14/technology/tiktok-underage-users-ftc.html

158.   Further, based on TikTok data leaked to the New York Times, internal TikTok documents show that the number of daily U.S. users in July of 2020 estimated by TikTok to be 14 or young—18 million—was almost as large as the number of over-14 users, around 20 million. While the rest of TikTok's U.S. users were classified as being "of unknown age."[15]

159.   TikTok also does not rely on users' self-reported age to categorize them, and knows when it has underage users engaged in harmful activities on its platform. Like Meta, TikTok has algorithms through which is creates estimated or approximate age for its users, including facial recognition algorithms that scrutinize profile pictures and videos, as well as other methods through which it can estimate age with reasonable certainty. TikTok knows that users under the age of 13 are using its social media product, including to post videos of themselves, which videos are public by default and result in harm to these underage users.[16]

160.   TikTok has tried to boost engagement and keep young users hooked to its social media product by any means necessary.

161.   TikTok has developed images and memes to enact images for users to decorate the videos they post. TikTok has also developed memes and other images for users to apply to images they post on TikTok. TikTok also has acquired publication rights to music that its users can incorporate in the pictures and videos they post on TikTok. When users incorporate images, memes and music supplied by TikTok into their postings, TikTok becomes a co-publisher of such content. A TikTok user who incorporates images, memes and musical content supplied by TikTok into their posts is functionally equivalent to a novelist who incorporates illustrations into her story. TikTok can no longer characterize the images, memes, and musical content it supplies to its users as third-party content as the novelist can disclaim responsibility for illustrations contained in her book.

162.   TikTok contracts for legal rights to this third-party content, such that it is not "third-party content" at all. TikTok's current Terms of Service grant TikTok sweeping sets

---

[15] *Id.*

[16] *Id.*

of rights as follows, and for example only,

> You or the owner of your User Content still own the copyright in User Content sent to us, but by submitting User Content via the Services, you hereby grant us an unconditional irrevocable, non-exclusive, royalty-free, fully transferable, perpetual worldwide licence to use, modify, adapt, reproduce, make derivative works of, publish and/or transmit, and/or distribute and to authorise other users of the Services and other third-parties to view, access, use, download, modify, adapt, reproduce, make derivative works of, publish and/or transmit your User Content in any format and on any platform, either now known or hereinafter invented.

163.    TikTok directly profits from the videos and pictures and other content its users create in collaboration with TikTok, as described above.

164.    TikTok knows that it is harming teens yet consistently opts for prioritization of profit over health and well-being of its teen users— the millions of teen users who continue to use its inherently dangerous and defective social media product every, single day.

**E.    Defendants' Social Media Products are Products**

165.    There is no dispute that the above-described social media products are designed and manufactured by Defendants, and further, Defendants refer to them as such and also patent various aspects of their products and the specific products at issue in this case.

166.    These products are designed to be used by minors and are actively marketed to teens and tweens across the United States, and were marketed to C.L.

167.    Defendants' user terms prohibit use of these social media products by any person under the age of 13. Regardless, Defendants know that children under 13 are using their products, and actively study and market to that population.

168.    Defendants' products are designed to be used by minors and are actively marketed to minors across the United States. Defendants market many of these products to minors through their own marketing efforts and design, and through their approval and permission to advertisers who create and target ads to young users.

169.    Defendants also are aware that large numbers of children under the age of 18 use its product without parental consent. At least in the case of TikTok and Snap, parental consent is required for use of their social media products by users under the age of 18. Yet

all Defendants design their social media products in a manner intended to allow and not prevent such use, including failure to verify age and identification and allowing and encouraging multiple accounts

170. Defendants each have patents relating to various aspects of their social media products, including patents relating to aspects of their recommendation technologies.

171. Defendants have designed their products in a manner that allows and/or does not prevent such use to increase user engagement and, thereby, increase their own profits.

**F.    Defendants' Business Model is Based on Maximizing User Screen Time and Defendants Know That Their Products Are Addictive**

172. Defendants advertise their products as "free," because they do not charge their users for downloading or using their products. What many users do not know is that, in fact, Defendants make a profit by finding unique and increasingly dangerous ways to capture user attention and target advertisements to their users. Defendants receive revenue from advertisers who pay a premium to target advertisements to specific demographic groups of users in the applications. Defendants also receive revenue from selling their users' data to third parties.

173. The amount of revenue Defendants receive is based upon the amount of time and level of user engagement on their platforms, which directly correlates with the number of advertisements that can be shown to each user.

174. Defendants use unknown and changing rewards that are designed to prompt users who consume their social media products in excessive and dangerous ways. Defendants know, or in the exercise of ordinary care should know, that their designs have created extreme and addictive usage by their minor users, and Defendants knowingly or purposefully designed its products to encourage such addictive behaviors. For example, all the achievements and trophies in Snapchat are unknown to users. The Company has stated that "[y]ou don't even know about the achievement until you unlock it." This design conforms to well-established principles of operant conditioning wherein intermittent reinforcement provides the most reliable tool to maintain a desired behavior over time.

175.    This design is akin to a slot machine but marketed toward minor users who are even more susceptible than gambling addicts to the variable reward and reminder system designed by Snapchat. The system is designed to reward increasingly extreme behavior because users are not actually aware of what action will unlock the next award.

176.    Facebook and Instagram, like Snapchat and TikTok, are designed around a series of features that do not add to the communication utility of the application, but instead seek to exploit minor users' susceptibility to persuasive design and unlimited accumulation of unpredictable and uncertain rewards, including "likes" and "followers." In the hands of children, this design is unreasonably dangerous to the mental well-being of underage users' developing minds, and has resulted in mental health harms to minor plaintiff C.L.

177.    According to industry insiders, Meta, Snap, and TikTok have employed thousands of psychologists and engineers to help make their products maximally addicting. For example, Instagram's "pull to refresh" is based on how slot machines operate. It creates an endless feed, designed to manipulate brain chemistry and prevent natural end points that would otherwise encourage users to move on to other activities.

178.    Meta, Snap, and TikTok do not warn users of the addictive design of their product. On the contrary, Meta, Snap, and TikTok actively conceal the dangerous and addictive nature of their products, lulling users and parents into a false sense of security. This includes consistently playing down their products' negative effects on teens in public statements and advertising, making false or materially misleading statements concerning product safety, and refusing to make their research public or available to academics or lawmakers who have asked for it.

179.    Meta, Snap, and TikTok have repeatedly represented to the public and governments around the world that their products are safe and not addictive.

180.    TikTok represents in its community guidelines that its priority is "safety, diversity, inclusion, and authenticity,"17 and Snap's Terms of Service claim "We try hard to

---

17 https://www.tiktok.com/community-guidelines?lang=en

keep our Services a safe place for all users."[18]

181.    Again, the amount of revenue Defendants receive is based upon the amount of time and user engagement on their platforms, which directly correlates with the number of advertisements that can be shown to each user. In short, Meta, Snap, and TikTok opted for user engagement over the truth and user safety.

182.    Meta, Snap, and TikTok's social media products are built around a series of design features that do not add to the communication and communication utility of the applications, but instead seek to exploit users' susceptibility to persuasive design and unlimited accumulation of unpredictable and uncertain rewards (including things like "likes" and "followers" and "views" and "streaks" and "trophies," These designs are unreasonably dangerous to the mental well-being of underage users' developing minds, and these social media companies know it.

183.    Meta, Snap, and TikTok know that their products are addictive, and that millions of teen users want to stop using them but cannot.

184.    Meta, Snap, and TikTok engineer their products to keep users, and particularly young users, engaged longer and coming back for more. This is referred to as "engineered addiction," and examples include features like bottomless scrolling, tagging, notifications, and live stories.

185.    Meta, Snap, and TikTok spend billions of dollars marketing their products to minors, and have deliberately traded in user harm for the sake of their already astronomical revenue stream.

**G.    Defendants Have Designed Complex Algorithms to Addict Teen Users and Their Business Models are Based on Maximizing User Screen Time**

186.    Meta, Snap, and TikTok have intentionally designed their products to maximize users' screen time, using complex algorithms designed to exploit human psychology and driven by the most advanced computer algorithms and artificial intelligence

---

[18] *See* Snap, Inc. Terms of Service, ¶ 9.

available to four of the largest technology companies in the world.

187.   Meta, Snap, and TikTok's algorithms select content for minor users not based on what they anticipate the user will prefer or to enhance their social media experience, but rather for the express purpose of habituating users to the Defendants' social media products. Meta, Snap, and TikTok's algorithms do not provide a neutral platform but rather specify and prompt the type of content to be submitted and determine particular types of content its algorithms promote.

188.   Meta, Snap, and TikTok designed and have progressively modified their products to promote problematic and excessive use that they know is indicative of addictive and self-destructive use.

189.   One of these features—present in Snapchat, Facebook, Instagram, and TikTok—is the use of complex algorithms to select and promote content that is provided to users in an unlimited and never-ending "feed." Defendants are well aware that algorithm-controlled feeds promote unlimited "scrolling"—a type of use those studies have identified as detrimental to users' mental health—however, this type of use allows Defendants to display more advertisements and obtain more revenue from each individual user.

190.   Meta, Snap, and TikTok's algorithm-controlled product feature are designed to promote content most likely to increase user engagement, which often means content that Defendants know to be harmful to their users. This is content that users would otherwise never see but for Defendants sorting, prioritizing, and/or affirmative pushing of such content to their accounts.

191.   In the words of one, high-level departing Meta employee,

> In September 2006, Facebook launched News Feed. In October 2009, Facebook switched from chronological sorting to an algorithmic ranking. 10 years later, in July 2019, Sen. Josh Hawley introduced a bill to the US Senate that would ban features in app feeds, such as infinite scroll.
>
> The response in 2006 was largely positive; the response in 2009 was negative from a vocal minority, but still largely positive; the response in 2019 was largely "lol, wut?" If I had to guess, the response to government regulation around engagement centric information feeds in 2026 will be "Omg finally".

"Why We Build Feeds" (October 4, 2019), at p. 1.[19]

192.    The addictive nature of Meta, Snap, and TikTok's products and the complex and psychologically manipulative design of their algorithms is unknown to ordinary consumers, particularly minors.

193.    Meta, Snap, and TikTok go to significant lengths to prevent transparency, including posing as a "free" social media platform, burying advertisements in personalized content, and making public statements about the safety of their products that simply are not true.

194.    Meta, Snap, and TikTok also have developed unique product features designed to limit, and have in other ways limited, parents' ability to monitor and prevent problematic use by their children.

195.    Meta, Snap, and TikTok's algorithms adapt to promote whatever content will trigger minor users' engagement and maximize their screen time. Defendants' algorithm designs do not distinguish, rank, discriminate, or prioritize between particular content based on whether it is helpful or harmful to the psychic well-being of their minor users. Once a minor user engages with abusive, harmful, or destructive content, Defendants' algorithms will direct the minor user to content that is progressively more abusive, harmful, and destructive to maximize the user's screen time.

---

[19] https://www.documentcloud.org/documents/21600853-tier1_rank_exp_1019

196.    Meta, Snap, and TikTok's algorithms are not simply tools meant to facilitate the communication and content of others but are content in and of themselves. Meta, Snap, and TikTok's algorithms do not function like traditional search engines that select particular content for users based on user inputs; they direct minor users to content based on far more than the individual users' viewing history. Meta, Snap, and TikTok's algorithms make recommendations not simply based on minor users' voluntary actions but also the demographic information and social media activity of the users' friends, followers, and cohorts. The user data that Meta, Snap, and TikTok's algorithms use to select content therefore encompasses far more information than voluntarily furnished by the particular user and include private information about the user that Meta, Snap, and TikTok discover through undisclosed surveillance of behavior both online and offline.

197.    These addiction-driven algorithms are designed to be content neutral. They adapt to the social media activity of individual users to promote whatever content will trigger a particular user's interest and maximize their screen time. That is, prior to the point when Meta, Snap, and TikTok have addicted their users and are then able to influence user preferences, their algorithm designs do not distinguish, rank, discriminate, or prioritize between types of content. For example, if the algorithm can increase User One engagement with elephants and User Two engagement with moonbeams, then Defendants' algorithm design will promote elephant content to User One and moonbeam content to User Two. These types of algorithms are solely quantitative devices and make no qualitative distinctions between the nature and type of content they promote to users – as long as those promotions increaser user engagement.

**H.    Minor Users' Incomplete Brain Development Renders Them Particularly Susceptible to Manipulative Algorithms with Diminished Capacity to Eschew Self-Destructive Behaviors and Less Resiliency to Overcome Negative Social Media Influences**

198.    The human brain is still developing during adolescence in ways consistent with adolescents' demonstrated psychosocial immaturity. Specifically, adolescents' brains are not yet fully developed in regions related to risk evaluation, emotional regulation, and

impulse control.

199.    The frontal lobes—and, in particular, the prefrontal cortex—of the brain play an essential part in higher-order cognitive functions, impulse control, and executive decision-making. These regions of the brain are central to the process of planning and decision-making, including the evaluation of future consequences and the weighing of risk and reward. They are also essential to the ability to control emotions and inhibit impulses. MRI studies have shown that the prefrontal cortex is one of the last regions of the brain to mature.

200.    During childhood and adolescence, the brain is maturing in at least two major ways. First, the brain undergoes myelination, the process through which the neural pathways connecting different parts of the brain become insulated with white fatty tissue called myelin. Second, during childhood and adolescence, the brain is undergoing "pruning"—the paring away of unused synapses, leading to more efficient neural connections. Through myelination and pruning, the brain's frontal lobes change to help the brain work faster and more efficiently, improving the "executive" functions of the frontal lobes, including impulse control and risk evaluation. This shift in the brain's composition continues throughout adolescence and into young adulthood.

201.    In late adolescence, important aspects of brain maturation remain incomplete, particularly those involving the brain's executive functions and the coordinated activity of regions involved in emotion and cognition. As such, the part of the brain that is critical for control of impulses and emotions and for mature, considered decision-making is still developing during adolescence, consistent with the demonstrated behavioral and psychosocial immaturity of juveniles.

202.    The algorithms in Meta, Snap, and TikTok's social media products are designed to exploit minor users' diminished decision-making capacity, impulse control, emotional maturity, and psychological resiliency caused by users' incomplete brain development. Defendants know, or in the exercise of reasonable care should know, that because their minor users' frontal lobes are not fully developed, they experience enhanced dopamine responses to stimuli on Defendants' social media platforms and are therefore much

more likely to become addicted to Defendants' products; exercise poor judgment in their social media activity; and act impulsively in response to negative social media encounters. Defendants also know, or in the exercise of reasonable care should know, that minor users of their social media products are much more likely to sustain serious physical and psychological harm through their social media use than adult users. Nevertheless, Defendants knowingly designed their social media products to be addictive to minor users and failed to include in their product design any safeguards to account for and ameliorate the psychosocial immaturity of their minor users.

**I.    Defendants Misrepresent the Addictive Design of Their Social Media Products**

203.    During the relevant time period, Meta, Snap, and TikTok stated in public comments that their products are not addictive and were not designed to be addictive. Defendants knew or should have known that those statements were untrue.

204.    During the relevant time period, Meta, Snap, and TikTok advertised via commercials and/or third parties that their products were fun and safe to use, and that Defendants employed their technologies to ensure safe and age-appropriate experiences. Defendants knew or should have known that those statements were untrue.

205.    Neither Meta, TikTok, or Snapchat warned users or their parents of the addictive and mentally harmful effects that the use of their products was known to cause amongst minor users. On the contrary, Defendants have gone to significant lengths to conceal and/or avoid disclosure as to the true nature of their products.

**J.    Plaintiff Expressly Disclaims Any and All Claims Seeking to Hold Defendants Liable as the Publisher or Speaker of Any Content Provided, Posted, or Created by Third Parties**

206.    Plaintiff seeks to hold Defendants accountable for their own alleged acts and omissions. Plaintiff's claims arise from Defendants' status as designers and marketers of dangerously defective social media product, as well as Defendants' own statements and actions, not as the speaker or publisher of third-party content.

207.    Defendants' have designed their products to be addictive. For example,

Defendants have developed and modified product features like the continuous loop feed and push notifications, to incentivize users to stay on the product as long as possible and to convince users to log back on. Defendants Meta, Snap, and TikTok even calculate the most effective time to send such notifications, which in the case of teen and tween users often means in the middle of the night and/or during school hours. Essentially, the times they are least likely to have access to Defendants' social media products, which also—as Defendants know—are the times that their health and well-being necessitate them not being on Defendants' social media product. Meta, Snap, and TikTok's products are designed to and do addict users on a content neutral basis.

208.    The structure of these social media products and the technologies Defendants' design and utilize are, standing alone, harmful to users and irrespective of content. For example, a primary purpose of Defendants' algorithm designs is to determine individual user preferences first so that Defendants can then influence user behavior and choices second— which is particularly dangerous in the case of teens.

209.    In the case of Meta, for example, Meta uses its product both to "experiment" on and test its users in ways heretofore unimagined, but also, it seeks to control user behavior through product features and capabilities and for the specific purpose of acquiring and retaining users. Defendants Snap, and TikTok likewise seek to control user behavior through product features and capabilities and for the specific purpose of acquiring and retaining users.

210.    On a content neutral basis, the manipulation and control these Defendants knowingly wield over their users daily is profoundly dangerous.

211.    Defendants are responsible for these harms. These harms are caused by Defendants' designs and design-decisions, and not any single incident of third-party content.

212.    Yet Defendants failed to warn minor users and their parents of known dangers arising from anticipated use of their social media products. These dangers are unknown to ordinary consumers but are known to Defendants. Moreover, these dangers do not arise from third-party content contained on Defendants' social media platforms. This lawsuit does not involve a suit against a web browser provider for making available third-party content. To

the contrary, Defendants,

    a.    Design and constantly re-design their social media products to attract and addict teens and children, their "priority" user group.

    b.    Design and continue to operate their social media products to ensure that teens and children can obtain unfettered access, even over parental objection.

    c.    Know when teens and children are opening multiple accounts and when they are accessing their products excessively and in the middle of the night.

    d.    Work with advertisers and influencers to create and approve harmful content and provide direct access to teens and children – a user population Defendants know to be vulnerable.

    e.    Operate and provide the above social media products with the single-minded goal of increasing user engagement, including but not limited to things like maintaining harmful social comparison features, approving product programming that promotes harmful content over clear dangers to user safety.

213.    While it may be that a third party creates a particular piece of harmful content, the teens and children harmed by Defendants' social media products are not being harmed by a single piece of harmful content. They are being harmed by Defendants' products, programming, and decisions to expose teens and children to harmful product features and to show teens and children a constant barrage of harmful content to obtain more advertising revenue and increase engagement.

214.    C.L. and children like her do not open social media accounts in the hopes of become addicted. Nonetheless, such children do become addicted, leading them to engage in foreseeable addict behaviors, such as lying to their parents, hiding their use of Defendants' products, losing control, becoming irritable and depressed when access is denied, and hyper-vigilance to avoid detection. These and other behaviors can and do result in serious harm to

Defendants' minor users and resulted in serious harm to Plaintiff.

215.   C.L. and children like her do not start using social media in the hopes of being exposed to product features that cause harm to them. Yet the use of Instagram, Snapchat, and TikTok involves harmful forms of social comparison and inevitably pushes such children towards harmful "rabbit holes," causing anxiety, depression, eating disorders, and self-harm—harms at least some of these Defendants acknowledge in internal documents. Defendants' products caused these harms to C.L  and her father.

216.   The harms at issue in this case do not relate to or arise from third party content, but rather, Defendants' product features and designs, including algorithms and other technology that (a) addicts minor users to their products; (b) amplify and promote harmful social comparison through product features; (c) affirmatively select and promote harmful content to vulnerable users based on its individualized demographic data and social media activity; and (d) put minor users in contact with dangerous adult predators and otherwise expose to them to seemingly unstoppable unwanted interactions from persons not on their friend list or equivalent. Indeed, the foregoing are merely examples of the kinds of harms at issue in this case.

217.   Defendants' products are addictive on a content neutral basis. Defendants design and operate their social media products in a manner intended to and that does change behavior and addict users, including through a natural selection process that does not depend on or require any specific type of third-party content, as well as mechanisms and features meant to release dopamine. Defendants deliberately addict teen users and the harms resulting from these addictions are foreseeable, even known, to Defendants.

218.   Defendants have designed other product features for the purpose of encouraging and assisting children in evasion of parental oversight, protection, and consent, which features are wholly unnecessary to the operation of Defendants' product. This includes but is not limited to Defendants' wholesale failure to check identification or verify validity of user-provided email credentials, while simultaneously implementing product design features (such as easier ability to switch between accounts, in the case of Meta) meant to

ensure easy access by children and teens, irrespective of parental consent. Likewise, Defendants—even those who claim to permit only one account—know that teen users are opening multiple accounts and fail to prevent such abuses.

219.    Defendants also promote, encourage, and/or otherwise contribute to the development of harmful content. This Complaint has quoted from just a few of the thousands of Meta documents disclosed by the Facebook whistleblower, which establish this, and Plaintiff anticipates finding the same types of evidence in discovery with Meta, TikTok, and Snap. One of biggest hurdles to discovery of these claims and the harms Defendants have caused is that none of these defendants have ever been willingly transparent or cooperative regarding disclosure of their product designs and operations. In this manner too these defendants have actively concealed such harms.

220.    Defendants also approve ads that contain harmful content and utilize private information of their minor users to precisely target them with content and recommendations, assessing what will provoke a reaction, including encouragement of destructive and dangerous behaviors. Again, Meta, Snap, and TikTok specifically select and push this harmful content, for which they are then paid, and do so both for that direct profit and to increase user engagement, resulting in more profits down the road.

221.    Defendants know that their products can push children "all the way from just something innocent like healthy recipes to anorexia promoting content over a very short period of time."[20] Defendants know that their products the content they are encouraging and helping to create is harmful to young users and choose "profits over safety"[21] any way.

222.    None of Plaintiff's claims rely on treating Defendants as the publisher or speaker of any third party's words or content. Plaintiff's claims seek to hold these Defendants accountable for their own allegedly wrongful acts and omissions, not for the speech of others or for any good faith attempts on the part of these Defendants to restrict access to

---

[20] https://www.rev.com/blog/transcripts/facebook-whistleblower-frances-haugen-testifies-on-children-social-media-use-full-senate-hearing-transcript ("October 5, 2021, Senate Hearing Transcript"), Ms. Francis Haugen at 00:37:34.
[21] *Id*. at 02:47:07.

objectionable content.

223.    Plaintiff is not alleging that Defendants are liable for what the third parties said, but for what Defendants did.

224.    None of Plaintiff's Claims for Relief set forth herein treat Defendants as a speaker or publisher of content posted by third parties. Rather, Plaintiff seeks to hold Defendants liable for their own speech and their own silence in failing to warn of foreseeable dangers arising from anticipate use of their products. Defendants could manifestly fulfill their legal duty to design a reasonably safe social product and furnish adequate warnings of foreseeable dangers arising out of the use of their products without altering, deleting, or modifying the content of a single third- party post or communication. Some examples include.

    a.    Not using their addictive and inherently dangerous algorithm and similar technologies in connection with any account held by a user under the age of 18.

    b.    Not permitting any targeted advertisements to any user under the age of 18.

    c.    Prioritizing internally their removal of harmful content (content their systems are promoting and amplifying) over the risk of losing some user engagement.

    d.    Requiring identification upon opening of a new account, requiring parental consent for users under the age of 18 (which Snap and TikTok currently claim to do but do not actually enforce in any way), and restricting users under the age of 18 to a single account. This is something teens have even asked these companies to do for their safety.

    e.    Requiring verification by email when a user opens a new account. Not requiring verification allows underage users to access these social media products and does not stop bad actors.

f.     Immediate suspension of accounts where Defendants have reason to know that the user is under the age of 13, including when the user declares that they are under the age of 13 in their bio or comments or chats and/or messages with any third party and where Defendants can determine an "estimated" age of under 13 based on other information they collect and/or have in their possession (including, for example, posted videos that clearly feature children under 13); and not allowing the account to resume until the user provides proof of age and identity and/or parental consent.

g.     Suspension of accounts and, in some cases, user bans, where Defendants have reason to know that the user is over the age of 18, but where they are providing information to suggest that they are minors and/or are representing themselves as minors to other users; and not allowing the account to resume until the user provides proof of age and identity.

h.     Removing social comparison features and/or hiding those features to reduce their harmful impact on teen users.

i.     Instituting advertising safeguards to ensure that Defendants are not profiting directly from or otherwise pushing or endorsing harmful advertising content, and removing advertising targeting tools so that advertisers cannot harm vulnerable user groups by aiming harmful advertisements at them.

j.     Requiring that all teen user accounts be set to private and not allowing any user under the age of 18 to change user settings to public.

k.     Removing all friend and group and content recommendation systems that involve teen users in any way (so, not recommending to teen users, but also, not recommending teen users to adults) and not permitting direct messaging, snaps, or other forms of direct

communication with any user under the age of 18 not already on the
other user's friend list.

225.   These are just some examples, all of which could be accomplished easily
and/or at commercially reasonable cost. Defendants know that they can make these change
and, in many cases, have discussed these or similar changes internally. However, they have
not instituted these types of safety features because they know that doing so would impact
their astronomical revenue

## VI.   PLAINTIFF SPECIFIC ALLEGATIONS

**A.   C.L.'s Mental Harms Were Proximately Caused by Meta, Snap, and TikTok's Inherently Dangerous Social Media Products**

226.   C.L is currently fourteen years old.

227.   C.L. was a happy and outgoing child, who loved spending time with her
friends and family. She was the center of attention and thrived in the spotlight.

228.   C.C. cannot be certain as to when his daughter opened each of her first social
media accounts, as he did not know about or consent to social media in his home. C.C. does,
however, believe that C.L. was nine years old (if not younger) when she opened her first
Instagram and Snapchat accounts, and nine or ten when she opened her first TikTok account.
All of these accounts, and any accounts currently used by C.L., were opened by C.C.'s minor
child without his knowledge or consent.

229.   Defendants distribute and children obtain access to Defendants' social media
products via school computers, friends' devices, video game consoles and smart TVs, and
any other device on which a child can access wi-fi. On information and belief, C.L. learned
how to access Defendants' products and would sneak access any chance she was able.

230.   Defendants knew or should have known that C.L. was under the age of 13.

231.   Defendants knew or should have known that C.L. lacked parental consent.

232.   C.L.'s secret use of and developing addiction to Defendants' products
coincided with a steady decline in her mental health.

233.   As C.L. became more locked-in to and dependent upon Defendants' social

media products, she began to resent C.C. for not allowing her to use them. She was lying to her father because of her growing addiction and had to maintain hyper vigilance to not get caught. These types of behaviors are common in the case of addicts and were foreseeable by Defendants when they knowingly designed and distributed, and then continued to distribute, addictive products to children like C.L. Defendants distributed these products for their own financial gain, despite knowledge of the harms they caused.

234.   As C.L. became more dependent on Defendants' addictive-design social media products, she felt like she couldn't sleep without them, which is common and foreseeable for children and teens addicted to Defendants' products – a fact of which Defendants also are aware. Eventually, C.L. would try to sneak access at night when C.C. was sleeping, resulting in severe and harmful sleep deprivation, and resulting anxiety, depression, and other mental harms.

235.   When C.C. finally discovered C.L.'s use of Defendants' social media products, there was nothing he could do to protect his daughter from them because of (1) her already established level of addiction and (2) Defendants' refusal to stop distributing those products to underage children and/or children under 18 who lack parental consent.

236.   When C.C. attempted to exercise his parental rights, including by taking away access to social media, C.L. had extreme reactions, including angry outbursts, physical violence, and the threat of self-harm. On more than one occasion, C.L. made clear that C.C. could not stop her from using Defendants' products, including by running away and putting herself in harm's way by using other devices and free wi-fi to access social media when using social media at home was no longer an option.

237.   This is a harm millions of parents in the U.S. currently are suffering because of how Defendants have designed their products. Defendants do not verify age, identity, or parental consent. They do not even verify the existence of a valid email or phone number. They also do not provide phone numbers and customer service representatives where a parent can report use by a minor without parental consent, or even a reasonably accessible email. And even when reported, Defendants do not automatically shut down accounts. Because of

Defendants' product designs, many parents do not know when an account exists and/or their child's usernames, while Defendants, on the other hand, actively encourage and allow the opening of multiple secret accounts (often referred to as FINSTA or SPAM accounts). Defendants Meta has referred to these secret accounts as a "unique value proposition" – that is, Defendants are able to increase their revenue significantly by simply disregarding their own terms of service and the rights of parents in the U.S.

238.    Plaintiff has been harmed by these inherently defective and harmful product designs. Defendants are aware of the defects and resulting harms and have chosen to not correct those issues despite the availability of unilateral changes that would keep children safe. They have made these decisions based on cost-benefit analyses, in which Defendants have chosen to value their own profits over human life.

239.    C.L.'s dependency on the products Defendants knowingly continued to distribute to her – despite her age, lack of parental consent, and harmful exposures and usage – caused severe sleep deprivation, anxiety, depression, self-harm, suicidal ideation, and attempted suicides. These are mental health harms caused by Defendants' products, a fact the world is only just now learning about, but which Defendants Meta, Snap, and TikTok knew or should have known for years based on their own research, findings, notifications, and because of the way they designed their products.

240.    As a result of her use of Defendants' products (as detailed above), C.L. attempted suicide, *twice*.  C.L. was admitted for inpatient treatment eight separate times, including a four month stay at a facility in Texas. She has been physically and mentally harmed by Defendants' inherently defective and harmful social media products.

241.    At all times relevant, the Meta, Snap, and TikTok products directed users to C.L. which users were not her friends, and, in some instances, those users exploited, bullied, and/or abuses C.L., causing further emotional distress and mental harm. These are users C.L. would never have met but for Defendants' recommendation algorithms, profile settings, and direct message products and settings, as well as similar product features that are designed to make Defendants' more money, but at the expense of a significant portion of their underage

users.

242.   At all times relevant, Defendants' products identified and directed harmful content to C.L. ranging from sexual and violent content to massive amounts of harmful social comparison content, disordered eating content, and self-harm consent. This is content C.L. was not looking for and did not want and would never have been exposed to but for Defendants' programming of their recommendation technologies. Defendants have programmed those technologies, specifically, to prioritize engagement over user safety, even in the case of children and teens. Defendants' products are designed such that they then further amplify such harms, including in how they present such materials (including advertisements for which Defendants are paid directly) to users. For example only, Defendant Meta has studied the issue and has determined that it is not any one piece of content causing harm, but rather, the volume at which Meta sends the content, which amplifies the harms to users like C.L. That is precisely what happened to C.L.

243.   For example, in the case of Instagram, C.L. would open her account to find her Explore page flooded with images of the "perfect" body – which images she did not request, search for, or even want. Likewise, the TikTok product sent video after video in a never-ending stream to C.L. on a continuous loop and such that C.L. would often sit down meaning to view TikTok for a few minutes, only to look up and realize that more than an hour had passed. More to the point, TikTok's recommendation technologies determined that the best way to lock-in C.L. was to identify and push on her harmful eating disorder and self-harm content. On information and belief, Snap likewise uses its technologies to recommend content, which technologies Snap programs for engagement over user safety. On information and belief, Defendants push this type of harmful content disproportionately to young girls and women.

244.   These are images and videos Defendants identified and aimed at C.L. for their own profit, and where Defendants knew or should have known that Defendants' method of delivery and identification and aiming of such content to persons like C.L. would result in harm. These types of product features – and not any one piece of advertising or user content

– caused C.L. to engage in harmful social comparisons, which caused anxiety, depression, and permanent damage to C.L.'s self-esteem and sense of self-worth.

245.    As C.L. became more locked into Defendants' harmful products, she lost interest in all activities outside of social media, increasing her depression and anxiety and causing her to feel more isolated and alone.

246.    C.C. had no way of knowing what Defendants' social media products were doing to his daughter—while, in sharp contrast, Meta, Snap and TikTok knew or should have known that they were causing these harms to C.L. including based on her age, usage information, and/or usage patterns—which each of these defendants collects and, on information and belief, closely tracks—and/or content to which each of these defendants were repeatedly exposing her via unsolicited methods, such as push notifications and algorithmically driven recommendation systems.

247.    Defendants Meta, Snap and TikTok knew or should have known that C.L. was under the age of 13 yet failed to restrict her access or notify her parent of her harmful use and account status.

248.    Defendants Meta, Snap and TikTok identified and amplified harmful content, resulting in depression, anxiety, lower self-confidence, suicidal ideation, and attempted suicide.

249.    But for Meta, Snap, and TikTok's failure to conduct a reasonable age verification, C.L. would not have been exposed to the harmful features and design of their respective social media products.

250.    But for certain product features (to name only a few examples, Facebook, Instagram, and TikTok's "like" features and Snapchat's "Snap Streak" feature, as well as all four defendants' amplification of harmful social comparison content based on the sheer volume it directs to young users), C.L. would not have experienced the addiction or the anxiety and depression that stem from harmful social comparison designs.

251.    But for the recommendation, public profile, and direct messaging settings designed, implemented, and utilized by all four of the social media products at issue, C.L.

would not have suffered exploitation and bullying by strangers utilizing Defendant Meta, Snap, and TikTok's products for that purpose and in a foreseeably damaging manner – that is, Defendants' products affirmatively connect complete strangers to minors and then provide those strangers with unsupervised and unfettered access to those minors. C.L. would not have been subjected to those persons and harmful interactions but for Defendants' products, programming, and operation of the same.

252.    But for the endless feed and explore features characteristic of these social media products, C.L. would not have experienced the harmful dependencies that these features were designed to promote, or the sleep deprivation, anxiety, depression, and related stressors and harms.

253.    As a proximate result of her addiction to Instagram, Snapchat, and TikTok and specifically due to the engineered addiction and recommendations and content these defendants selected and showed to C.L., a minor user, C.L. subsequently developed injuries including, but not limited to, multiple periods of suicidal ideation, anxiety, fatigue, and inability to sleep, resulting in serious physical and emotional harms.

254.    Defendants Meta and Snap have also designed their products, including by disappearing or time-sensitive messaging features, to frustrate parents like C.C. from exercising their parental rights to monitor, protect, and ensure the safety of their children.

255.    Defendants have specifically designed their products to allow minors to use, become addicted to, and abuse their products without consent of parents like C.C.

256.    Defendants Meta, Snap, and TikTok have specifically designed their products to be appealing to minors but failed to exercise the ordinary care owed to underage business invitees to prevent the rampant, foreseeable, and deleterious impact on minors, like C.L., that such products have because of their objectives and design.

257.    Neither C.L. nor C.C. were aware of the clinically addictive and harmful effects of these products when C.L. began to use them.

258.    Defendants failed to warn C.L. and C.C. of the dangers of addiction, sleep deprivation, problematic use, harmful social comparison features and risk of exploitation and

abuse due to their product features and settings, and misrepresented the safety, utility, and non-addictive properties of their products. See examples, infra.

259.    As a result of C.L.'s extensive and problematic use of the Meta, Snap, and TikTok social media products, she has developed numerous mental health conditions what she will struggle with for the rest of her life. This includes but is not limited to her ongoing addiction to these products, which is severe to the point of causing physical discomfort when C.L. does not have access and will likely require professional treatment, as well as anxiety, depression, and related harms.

## VII.    PLAINTIFF'S CLAIMS

### COUNT I - STRICT PRODUCT LIABILITY (Design Defect)

260.    Plaintiff realleges each and every allegation contained in paragraphs 1 through 259 as if fully stated herein.

261.    Under Restatement (Second) of Torts § 402(a) and California law, one who sells any product in a defective condition unreasonably dangerous to the user is subject to liability for physical harm thereby caused to the user if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition which it was sold.

262.    Defendants' products are defective because the foreseeable risks of harm posed by the product's design could have been reduced or avoided by the adoption of a reasonable alternative design by Defendants and the omission of the alternative design renders the product not reasonably safe. These defective conditions rendered these products unreasonably dangerous to persons or property and existed at the time the product left Defendants' control, reached the user or consumer without substantial change in the condition and its defective condition was a cause of Plaintiff's injuries.

263.    Defendants designed, manufactured, marketed, and sold social media products that were unreasonably dangerous because they were designed to be addictive to the minor users to whom Defendants actively marketed and because the foreseeable use of Defendants' products causes mental and physical harm to minor users.

264.    Defendants' products were unreasonably dangerous because they contained numerous design characteristics that are not necessary for the utility provided to the user but are unreasonably dangerous and implemented by Defendants solely to increase the profits they derived from each additional user and the length of time they could keep each user dependent on their product.

**A.    Inadequate Safeguards From Harmful and Exploitative Content**

265.    Facebook, Instagram, Snapchat, and TikTok are defectively designed.

266.    As designed, Facebook, Instagram, Snapchat, and TikTok algorithms and other product features are not reasonably safe because they affirmatively direct minor users to harmful and exploitative content while failing to deploy feasible safeguards to protect vulnerable teens from such harmful exposures. It is feasible to design an algorithm and technologies that substantially distinguish between harmful and innocuous content and protect minor users from being exposed to harmful content without altering, modifying, or deleting any third-party content posted on Defendants' social media products. The cost of designing these products to incorporate this safeguard would be negligible while benefit would be high in terms of reducing the quantum of mental and physical harm sustained by minor users and their families.

267.    As designed, Facebook, Instagram, Snapchat, and TikTok algorithms and other product features are not reasonably safe because they affirmatively direct and recommend minor users to harmful groups and other users, while failing to deploy feasible safeguards to protect vulnerable teens from such harmful exposures. It is feasible to design an algorithm and technologies that do not make harmful connection recommendations to minor users, or any connection recommendations at all; it is feasible to design algorithm and technologies that do not direct harmful groups to minor users, or any group recommendations at all; and it is feasible to restrict access to minor users by strangers and adult users via direct messaging, to restrict and limit such access to users already on a minor user's "friend" list, or to prevent such access altogether. Defendants know that these product features cause a significant number of harms to their minor users, such as sexual exploitation, bullying, and

encouragement of self-harm and suicide – all of which are at issue in this case.

268.   Defendants also engage in conduct, outside of the algorithms and related technologies themselves, that is designed to promote harmful and exploitative content as a means of increasing their revenue from advertisements. This includes but is not limited to efforts to encourage advertisers to design ads that appeal to minors, including teens like C.L. and product design features intended to attract and engage minor users to these virtual spaces where harmful ad content is then pushed to those users in a manner intended to increase user engagement, thereby increasing revenue to Defendants at the direct cost of user wellbeing.

269.   Reasonable users (and their parents) would not expect that Defendants' products would knowingly expose them to such harmful content and/or that Defendants' products would direct them to harmful content at all, much less in the manipulative and coercive manner that they do. Defendants have and continue to knowingly use their algorithms and other technologies on users in a manner designed to affirmatively change their behavior, which methods are particularly effective on (and harmful to) Defendants' youngest users.

**B.    Failure to Verify Minor Users' Age and Identity**

270.   Facebook, Instagram, Snapchat, and TikTok are defectively designed.

271.   As designed, Defendants' products are not reasonably safe because they do not provide for adequate age verification by requiring users to document and verify their age and identity.

272.   Adults frequently set up user accounts on Defendants' social media products disguising their identity and/or posing as minors to groom unsuspecting minors to exchange sexually explicit content and images, which frequently progresses to sexual exploitation and trafficking, and commercial sex acts.

273.   Minor users of social media and their parents do not reasonably expect that prurient adults set up fraudulent accounts on Defendants' social media products and pose as minors for malign purposes.

274.   Likewise, minor users whose parents have taken affirmative steps to keep

them away from Defendants' products often open multiple accounts, such that Defendants know or have reason to know that the user is underage and/or does not have parental permission to use their product. Defendants already have the information and means they need to ascertain with reasonable certainty their users' actual age. Defendants utilize these tools to investigate, assess, and report on percentages and totals of underage users for internal assessment purposes. They then choose to simply do nothing about that information as it relates to the specific, underaged users themselves.

275.     Reasonably accurate age and identity verification is not only feasible but widely deployed by online retailers and internet service providers. Defendants not only can estimate the age of their users, but they do.

276.     The cost of incorporating age and identify verification into Defendants' products would be negligible, whereas the benefit of age and identity verification would be a substantial reduction in severe mental health harms, sexual exploitation, and abuse among minor users of Defendants' products.

**C.     Inadequate Parental Control and Monitoring**

277.     Facebook, Instagram, Snapchat, and TikTok are defectively designed.

278.     Defendants have intentionally designed products to frustrate the exercise of parental responsibility by their minor users' parents. Parents have a right to monitor their children's social media activity to protect them from harm. Defendants have designed products that make it difficult, if not impossible, for parents to exercise parental responsibility.

279.     It is feasible to design a social media product that requires parental consent for users under the age of 18 and prohibits users under the age of 13.

280.     Defendants' products are also defective for lack of parental controls, permission, and monitoring capability available on many other devices and applications.

281.     Defendants' products are designed with specific product features intended to prevent and/or interfere with parents' reasonable and lawful exercise of parental control, permission, and monitoring capability available on many other devices and applications.

**D.      Intentional Direction of Minor Users to Harmful and Exploitative Content**

282.    Facebook, Instagram, Snapchat, and TikTok are defectively designed.

283.    Default "recommendations" communicated to new teenage users, including C.L. purposefully steered her toward content Defendants knew to be harmful to children of this age and gender.

284.    Ad content pushed to new minor users, including C.L. because of her age and vulnerability, purposefully steer those users toward content Defendants know to be harmful to children of her age and gender.

**E.      Design of Addictive Social Media Products**

285.    Facebook, Instagram, Snapchat, and TikTok are defectively designed.

286.    As designed, Defendants' social media products are addictive to minor users as follows: When minors use design features such as "likes" or "streaks" it causes their brains to release dopamine, which creates short term euphoria. However, as soon as dopamine is released, minor users' brains adapt by reducing or "downregulating" the number of dopamine receptors that are stimulated and their euphoria is countered by dejection. In normal stimulatory environments, this dejection abates, and neutrality is restored. However, Defendants' algorithms are designed to exploit users' natural tendency to counteract dejection by going back to the source of pleasure for another dose of euphoria. As this pattern continues over a period of months and the neurological baseline to trigger minor users' dopamine responses increases, they continue to use the social media products at issue, not for enjoyment, but simply to feel normal. Once they stop using these products, minor users experience the universal symptoms of withdrawal from any addictive substance including anxiety, irritability, insomnia, and craving.

287.    Addiction is not restricted to a substance abuse disorders. Rather, the working definition of addiction promulgated in the seminal article Addictive behaviors: Etiology and Treatment published by the American Psychological Association in its 1988 Annual Review of Psychology defines addiction as,

a repetitive habit pattern that increases the risk of disease and/or associated personal and social problems. Addictive behaviors are often experienced subjectively as 'loss of control' – the behavior contrives to occur despite volitional attempts to abstain or moderate use. These habit patterns are typically characterized by immediate gratification (short term reward), often coupled with delayed deleterious effects (long term costs). Attempts to change an addictive behavior (via treatment or self-initiation) are typically marked with high relapse rates.

288.   Addiction researchers agree that addiction involves six core components: (1) salience—the activity dominates thinking and behavior; (2) mood modification—the activity modifies/improves mood; (3) tolerance—increasing amounts of the activity are required to achieve previous effects; (4) withdrawal—the occurrence of unpleasant feelings when the activity is discontinued or suddenly reduced; (5) conflict—the activity causes conflicts in relationships, in work/education, and other activities; and (6) relapse—a tendency to revert to earlier patterns of the activity after abstinence or control.

289.    Social media addiction has emerged as a problem of global concern, with researchers all over the world conducting studies to evaluate how pervasive the problem is. Addictive social media use is manifested when a user (10 becomes preoccupied by social media (salience); (2) uses social media in order to reduce negative feelings (mood modification); (3) gradually uses social media more and more in to get the same pleasure from it (tolerance/craving); (4) suffers distress if prohibited from using social media (withdrawal); (5) sacrifices other obligations and/ or cases harm to other important life areas because of their social media use (conflict/functional impairment); and (6) seeks to curtail their use of social media without success (relapse/loss of control).

290.   The Bergen Facebook Addiction Scale (BFAS) was specifically developed by psychologists in to assess subjects' social media use using the aforementioned addiction criteria, and is by far the most widely used measure of social media addiction. Originally designed for Facebook, BFAS has since been generalized to all social media. BFAS has been translated into dozens of languages, including Chinese, and is used by researchers throughout the world to measure social media addiction.

291.   BFAS asks subjects to consider their social media usage with respect to the

six following statements and answer either (1) very rarely, (2) rarely, (3) sometimes, (4) often, or (5) very often,

    a.    You spend a lot of time thinking about social media or planning how to use it.

    b.    You feel an urge to use social media more and more.

    c.    You use social media in order to forget about personal problems.

    d.    You have tried to cut down on the use of social media without success.

    e.    You become restless or troubled if you are prohibited from using social media.

    f.    You use social media so much that it has had a negative impact on your job/studies.

Subjects who score a "4" or "5" on at least 4 of those statements are deemed to suffer from social media addiction.

292.    Addictive use of social media by minors is psychologically and neurologically analogous to internet gaming disorder as described in the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5), which is used by mental health professionals to diagnose mental disorders. Gaming addiction is a recognized mental health disorder by the World Health Organization and International Classification of Diseases and is functionally and psychologically equivalent to social media addition.

293.    The diagnostic symptoms of social media addiction among minors are the same as the symptoms of addictive gaming referenced in DSM 5 and include:

    a.    Preoccupation with social media and withdrawal symptoms (sadness, anxiety, irritability) when device is taken away or not possible.

    b.    Tolerance, the need to spend more time using social media to satisfy the urge.

    c.    Inability to reduce social media usages, unsuccessful attempts to quit gaming.

d.     Giving up other activities, loss of interest in previously enjoyed activities due to social media usage.

e.     Continuing to use social media despite problems.

f.     Deceiving family members or others about the amount of time spent on social media.

g.     The use of social media to relieve negative moods, such as guilt or hopelessness; and

h.     Jeopardized school or work performance or relationships due to social media usage.

294.    Defendants' advertising profits are directly tied to the quantity of their users' online time and engagement, and their algorithms and other product features are designed to maximize the time users spend using the product by directing them to content that is progressively more and more stimulative. Defendants enhance advertising revenue by maximizing users' time online through a product design that addicts them to the platform. However, reasonable minor users and their parents do not expect that online social media platforms are psychologically and neurologically addictive.

295.    It is feasible to make Defendants' products not addictive to minor users by turning off the algorithms, limiting the frequency and duration of access, and suspending service during sleeping hours. Designing software that limits the frequency and duration of minor users' screen use and suspends service during sleeping hours could be accomplished at negligible cost; whereas the benefit of minor users maintaining healthy sleep patterns would be a significant reduction in depression, attempted and completed suicide, and other forms self-harm among this vulnerable age cohort.

**F.     Inadequate Notification of Parents of Dangerous and Problematic Social Media Usage by Minor Users**

296.    Facebook, Instagram, Snapchat, and TikTok are defectively designed.

297.    Defendants' products are not reasonably safe as designed because they do not include any safeguards to notify users and their parents of usage that Defendants knows to

be problematic and likely to cause negative mental health effects to users, including excessive passive use and use disruptive of normal sleep patterns. This design is defective and unreasonable.

298.    It is reasonable for parents to expect that social media companies that actively promote their platforms to minors will undertake reasonable efforts to notify parents when their child's use becomes excessive or occurs during sleep time. It is feasible for Defendants to design a product that identifies a significant percentage of its minor users who are using the product more than three hours per day or using it during sleeping hours at negligible cost.

299.    Defendants' products are not reasonably safe as designed because, despite numerous reported instances of child sexual solicitation and exploitation by adult users, Defendants have not undertaken reasonable design changes to protect underage users from this abuse, including notifying parents of underage users when they have been messaged or solicited by an adult user or when a user has sent inappropriate content to minor users.

300.    Defendants' entire business is premised upon collecting and analyzing user data and it is feasible to use Defendants' data and algorithms and other technologies to identify and restrict improper sexual solicitation, exploitation, and abuse by adult users.

301.    Moreover, it is reasonable for parents to expect that platforms such as Instagram, Snapchat, and TikTok, which actively promote their services to minors, will undertake reasonable efforts to identify users suffering from mental injury, self-harm, or sexual abuse and implement technological safeguards to notify parents by text, email, or other reasonable means that their child is in danger.

302.    As a proximate result of these dangerous and defective design attributes of Defendants' product, C.L. suffered and is continuing to suffer mental harm. Plaintiff did not know, and in the exercise of reasonable diligence could not have known, of these defective design in Defendants' products until late 2021.

303.    As a result of these dangerous and defective design attributes of Defendants' products, Plaintiff C.C. has suffered emotional distress and pecuniary hardship due to his child's mental harms.

304.     Defendants are further liable to Plaintiff for punitive damages based upon the willful and wanton design of their products that were intentionally marketed and sold to underage users, whom they knew would be seriously harmed through their use of Instagram, Snapchat, and TikTok.

**COUNT II – STRICT PRODUCT LIABILITY (Failure to Warn)**

305.     Plaintiff realleges each and every allegation contained in paragraphs 1 through 304 as if fully stated herein.

306.     Defendants' products are defective because of inadequate instructions or warnings because the foreseeable risks of harm posed by these products could have been reduced or avoided by the provision of reasonable instructions or warnings by the manufacturer and the omission of the instructions or warnings renders the product not reasonably safe. This defective condition rendered the products unreasonably dangerous to persons or property, existed at the time the products left Defendants' control, reached the user or consumer without substantial change in the condition in which they were sold, and were a cause of Plaintiff's injuries.

307.     Defendants' products are unreasonably dangerous and defective because they contain no warning to users or parents regarding the addictive design and effects of Instagram, Snapchat, and TikTok.

308.     Defendants' social media product rely on highly complex and proprietary algorithms and similar technologies that are both undisclosed and unfathomable to ordinary consumers, who do not expect that social media platforms are physically and/or psychologically addictive.

309.     The magnitude of harm from addiction to Defendants' product is horrific, ranging from simple diversion from academic, athletic, and face-to-face socialization to sleep loss, severe depression, anxiety, self-harm, and suicide.

310.     The harms resulting from minors' addictive use of social media platforms have been not only well-documented in the professional and scientific literature, but Defendants had actual knowledge of such harms.

311.    Defendants' products are unreasonably dangerous because they lack any warnings that foreseeable product use can disrupt healthy sleep patterns or specific warnings to parents when their child's product usage exceeds healthy levels or occurs during sleep hours. Excessive screen time is harmful to adolescents' mental health and sleep patterns and emotional well-being. Reasonable and responsible parents are not able to accurately monitor their child's screen time because most adolescents own or can obtain access to mobile devices and engage in social media use outside their parents' presence.

312.    It is feasible for Defendants' products to report the frequency and duration of their minor users' screen time to their parents without disclosing the content of communications at negligible cost, whereas parents' ability to track the frequency, time and duration of their minor child's social media use are better situated to identify and address problems arising from such use and to better exercise their rights and responsibilities as parents.

313.    Defendants knew about these harms, knew that users and parents would not be able to safely use their products without warnings, and failed to provide warnings that were adequate to make the product reasonably safe during ordinary and foreseeable use by children.

314.    As a result of Defendants' failure to warn, C.L suffered and continue to suffer severe mental harm from her use of Facebook, Instagram, Snapchat, and TikTok.

315.    As a result of Defendants' failure to warn, Plaintiff C.C. has suffered emotional distress and pecuniary hardship due to his child's mental harm resulting from social media addiction.

316.    Defendants are further liable to Plaintiff for punitive damages based upon their willful and wanton failure to warn of known dangers of their products that were intentionally marketed and sold to teenage users, whom they knew would be seriously harmed through their use of Facebook, Instagram, Snapchat, and TikTok.

## COUNT III – NEGLIGENCE

317.    Plaintiff realleges each and every allegation contained in paragraphs 1

through 316 as if fully stated herein.

318.    At all relevant times, Defendants had a duty to exercise reasonable care and caution for the safety of individuals using their products, such as C.L.

319.    Defendants owe a heightened duty of care to minor users of their social media products because adolescents' brains are not fully developed, which results in a diminished capacity to make good decisions regarding their social media usages, eschew self-destructive behaviors, and overcome emotional and psychological harm from negative and destructive social media encounters.

320.    As product manufacturers marketing and selling products to consumers, Defendants owed a duty to exercise ordinary care in the manufacture, marketing, and sale of their products, including a duty to warn minor users and their parents of hazards that Defendants knew to be present, but not obvious, to underage users and their parents.

321.    As business owners, Defendants owe their users who visit their social media platforms and from whom they derive billions of dollars per year in advertising revenue a duty of ordinary care substantially similar to that owed by physical business owners to its business invitees.

322.    Defendants were negligent, grossly negligent, reckless and/or careless in that they failed to exercise ordinary care and caution for the safety of underage users, like C.L., using their social media products.

323.    Defendants were negligent in failing to conduct adequate testing and failing to allow independent academic researchers to adequately study the effects of their products and levels of problematic use amongst teenage users. Defendants know that their products are harmful, cause extensive mental harm, and that minor users are engaging in problematic and addictive use that their parents are helpless to monitor and prevent.

324.    Defendants are negligent in failing to provide adequate warnings about the dangers associated with the use of social media products and in failing to advise users and their parents about how and when to safely use their social media platforms and features.

325.    Defendants are negligent in failing to fully assess, investigate, and restrict the

use of their social media products by adults to sexually solicit, abuse, manipulate, and exploit minor users of their social media products.

326.    Defendants are negligent in failing to provide users and parents the tools to ensure their social media products are used in a limited and safe manner by underage users.

327.    As a result of Defendants' negligence, C.L. suffered and continue to suffer severe mental harm from their use of Facebook, Instagram, Snapchat, and TikTok.

328.    As a result of Defendants' negligence, Plaintiff C.C. suffered emotional distress and pecuniary hardship due to his child's mental harm resulting from social media addiction.

329.    Defendants are further liable to Plaintiff for punitive damages based upon its willful and wanton conduct toward underage users, including C.L. whom they knew would be seriously harmed through use of their social media products.

**COUNT IV – VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW**

**(Cal. Bus. & Prof. Code §§ 17200, et seq.)**

330.    Plaintiff realleges each and every allegation contained in paragraphs 1 through 329 as if fully stated herein.

331.    Defendants are corporations, and thus a "person," as defined by California Business & Professions Code § 17201.

332.    The UCL prohibits all conduct that is unlawful, unfair, or fraudulent.

333.    Defendants' conduct is unlawful as set forth in Counts I–III, above.

334.    Defendants' conduct is unlawful also because it has knowledge of users under the age of 13 on its platform and, in fact, actively targets, markets to, and encourages use of its social media product by minors under the age of 13.

335.    Defendants engaged in fraudulent and deceptive business practices in violation of the UCL by promoting products to underage users, including C.L., while concealing critical information regarding the addictive nature and risk of harm these products pose. Defendants knew and should have known that its statements and omissions regarding the addictive and harmful nature of its product were misleading and therefore likely to

deceive the members of the public who use Defendants' products and who permit their underage children to use Defendants' products.

336.    Defendants' practices are unfair and violate the UCL because they offend established public policy, and because the harm these practices cause to consumers greatly outweighs any benefits associated with them.

337.    Defendants' conduct has resulted in substantial injuries that Plaintiff could not reasonably have avoided because of Defendants' deceptive conduct. This substantial harm is not outweighed by any countervailing benefits to consumers or competition.

338.    As a direct and proximate result of the foregoing acts and practices, Defendants have received, or will receive, income, profits, and other benefits, which it would not have received if it had not engaged in the violations of the UCL described herein. As a direct and proximate result of the foregoing acts and practices, Defendants have also obtained an unfair advantage over similar businesses that have not engaged in such practices.

339.    As a result of Defendants' UCL violations, Plaintiff has suffered injury in fact and lost money as set forth herein.

340.    Accordingly, Plaintiff seeks injunctive and equitable relief to halt and remedy Defendants' unlawful, fraudulent, and unfair conduct.

**COUNT V- UNJUST ENRICHMENT**

341.    Plaintiff realleges each and every allegation contained in paragraphs 1 through 340 as if fully stated herein.

342.    As a result of Defendants' conduct detailed herein, Defendants received a benefit. Because Defendants advertising profits are directly tied to the number of user accounts and the amount of time those users spend on their products, Defendants benefited directly from C.L's problematic use of their products from the amount of time C.L. spent on their products, without C.C.'s knowledge or consent.

343.    It would be unjust and inequitable for Defendants to retain the ill-gotten benefits at Plaintiff's expense and in light of Defendants' acts and omissions described

herein.

344.   Accordingly, Plaintiff seeks damages in an amount to be proven at trial.

### COUNT VI – INVASION OF PRIVACY

### (California Constitutional Right to Privacy, Cal. Const. Art. 1, § 1)

345.   Plaintiff realleges each and every allegation contained in paragraphs 1 through 344 as if fully stated herein.

346.   Defendants intentionally intruded upon Plaintiff's solitude, seclusion, or private affairs by knowingly designing its product with features that were intended to, and did, frustrate parents' ability to monitor and control their children's social media usage.

347.   These intrusions are highly offensive to a reasonable person, particularly given Defendants' interference with the fundamental right of parenting and its exploitation of children's special vulnerabilities for commercial gain.

348.   Plaintiff was harmed by Defendants' invasion of privacy, as detailed herein.

349.   Plaintiff therefore seeks compensatory and punitive damages in amounts to be determined at trial, as well as injunctive relief requiring Defendants to cease the harmful practices described throughout this complaint.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants for relief as follows:

1.   Past physical and mental pain and suffering of C.L in an amount to be more readily ascertained at the time and place set for trial.

2.   Past physical and mental pain and suffering of C.C., in an amount to be more readily ascertained at the time and place set for trial.

3.   Monetary damages suffered by C.C.

4.   Punitive damages.

5.   For the reasonable costs and attorney and expert/consultant fees incurred in this action.

6.    For injunctive relief including prohibition of each of the following,

    a)    Distribution to any user without a verified email address.

    b)    Distribution to any user without a verified phone number.

    c)    Distribution to any user without proof of identity or, in the case of users under the age of 18, proof of consent by a parent or guardian.

    d)    Distribution to any user under the age of 18 without also obtaining a verified email address and phone number for the user's parent or guardian.

    e)    Distribution to any user under the age of 18 where a parent or guardian has provided written (including email) notice that their child does not have permission to use Defendants' social media product (also requiring Defendants to provide a physical and email address where notices can be sent).

    f)    For users under the age of 18, distribution of any social media product for more than two hours in a 24-hour period.

    g)    For users under the age of 18, distribution of any social media product during the hours of 11 p.m. and 6 a.m., utilizing the time zone where the minor user is reasonably believed to be located and/or the time zone applicable at the time the account was opened.

    h)    For users under the age of 16, distribution of any social media product during any times of day not approved by the minor user's parent or guardian.

    i)    For users under the age of 16, access to any "group" that is not publicly visible (also requiring Defendants to provide separate, email notice to the parent or guardian each time the user joins a new group).

    j)    Distribution to any user of more than one account.

    k)    Distribution to any user over the age of 18, but who has been found to have represented or claimed on their profile, postings, or in messaging features that they are under the age of 18.

l)   Distribution to any user on the sex offender registry list.

m)   Use of algorithms and similar technologies to identify, suggest, direct, or provide unsolicited content to any user under the age of 18.

n)   Use of algorithms and similar technologies to rank or order any content shown to any user under the age of 18 except via objective and transparent methods, for example, ranking in chronological order.

o)   Use of visible "likes" and similar reaction and social comparison features.

p)   Use of any feature that requires users to log onto the product at specific days, times, or durations to maintain any form of status, standing, or rewards, including but not limited to the Snap Streak feature.

q)   Use of any feature that promises or offers hidden rewards, i.e. rewards where the identity or nature of the reward is not known ahead of time, like Trophies.

r)   Use of avatars, emojis, cartoons, or any other aesthetic feature that foreseeably targets or appeals to minors.

s)   Conditioning use of any game provided on opening of a social media account.

t)   Targeting of advertisements based on gender and/or protected class status.

u)   Targeting of any content whatsoever based on protected class status.

v)   Marketing to any person under the age of 18.

w)   Collection of any consumer-related data from any third party relating to any user under the age of 18.

x)   Provision of any consumer-related data to any third party relating to any user under the age of 18.

y)   Collection of any data about any user under the age of 18 from any source, except for information provided at account opening, account activities and communications, and other data reasonably necessary to operate the social media product.

z)   Approval, distribution, and/or creation or encouragement of harmful advertising content, including but not limited to content that encourages drug use or eating disorders.

aa)   For users under the age of 18, any setting that makes the account public or in any way visible to any person not specifically "connected" to the user.

bb)   For users under the age of 18, any setting or tool through which communication is allowed with any person not already "connected" to the minor user. This includes but is not limited to thinks like Messenger, Direct Messaging, Snaps, and similar direct communication features.

cc)   For users under the age of 16, any feature of setting that allows them to a "connect" with any other user absent parental consent and confirmation of parental consent to the "connection."

dd)   Use of any friend, connection, or follow recommendation tool in connection with any user under the age of 18, which means not making recommendations to the minor user and not making recommendations about the minor user.

ee)   Use of any group, page, or subject matter recommendation tool in connection with any user under the age of 18, which means not making recommendations to the minor user and not making recommendations about the minor user.

ff)   Use of any disappearing, expiring, or automatic deletion features on any communications or communication content sent to or received by any user under the age of 18.

gg)   Use of any feature that allows any user under the age of 18 to restrict access to content or otherwise conceal content from others, for example, the Snapchat My Eyes Only Feature

hh)   Use of any feature that tracks and/or shares the location of any user under the age of 18.

ii)   Use of any feature that allows any user under the age of 16 to send or receive money or any cash equivalent.

jj)   Deletion of any identification or user information collected about any user under the age of 18 (and requiring provision of all such within three (3) business days of any written request by parent or guardian).

kk)   Deletion of any identification of any account activity data for any account held by any user under the age of 18 (and requiring provision of all such within five (5) business days of any written request by parent or guardian).

ll)   Deletion of any communications sent or received by any user under the age of 18, including the communication as well as any content included in or linked to the communication (and requiring provision of all such communications within three (3) business days of any written request by parent or guardian).

mm)   Use of any push notifications or reminders or other notifications relating to activity taking place on social media.

nn)   Use of any workflows that discourage any user from closing their account.

oo)   Sending of any communication to any user under the age of 18 that is not also sent to that user's parent or guardian.

7.   For such other and further relief as this Court deems just and equitable.

Dated: August 17, 2022.

SOCIAL MEDIA VICTIMS LAW CENTER PLLC

By:_____
     Laura Marquez-Garrett, SBN 221542

Laura Marquez-Garrett
laura@socialmediavictims.org
1390 Market Street, Suite 200
San Francisco, CA 94102
Telephone: (206) 294-1348

Matthew Bergman
matt@socialmediavictims.org

Glenn Draper
glenn@socialmediavictims.org
SOCIAL MEDIA VICTIMS LAW CENTER
821 Second Avenue, Suite 2100
Seattle, WA 98104
Telephone: (206) 741-4862
Facsimile: (206) 957-9549

Christopher A. Seeger
cseeger@seegerweiss.com
Christopher Ayers
cayers@seegerweiss.com
SEEGER WEISS LLP
55 Challenger Road
Ridgefield Park, NJ 07660
Telephone: 973-639-9100
Facsimile: 973-679-8656

Robert H. Klonoff
klonoff@usa.net
ROBERT KLONOFF, LLC
2425 S.W. 76th Ave.
Portland, Oregon 97225
Telephone: (503) 702-0218
Facsimile: (503) 768-6671

Attorneys for Plaintiff